THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

\* \* \* \* \*

UNITED STATES OF AMERICA    \*  NO. 6:17-CR-40-RC-KNM-1
                            \*  Beaumont, Texas
vs.                         \*
                            \*  3:04 p.m. - 6:20 p.m.
THEODORE ROBERT WRIGHT, III \*  July 5, 2017

\* \* \* \* \*

**ARRAIGNMENT/PRETRIAL/DETENTION HEARING**

BEFORE THE HONORABLE CHIEF JUDGE RON CLARK
UNITED STATES DISTRICT JUDGE

\* \* \* \* \*

Proceedings recorded by computer stenography
Produced by computer-aided transcription

*Edward L. Reed*
Court Reporter
9251 Lynne Circle
Orange, Texas 77630 \* 409-330-1605

1  **APPEARANCES:**

2  For the United States:

3        MR. L. FRANK COAN, JR.
         **U.S. Attorney's Office**
4        110 N. College, Suite 700
         Tyler, Texas 75702

5
   For the Defendant:
6
         MR. GABRIEL L. GRASSO
7        **Law Office of Gabriel L. Grasso, P.C.**
         9625 Hillwod Dr., Suite 190
8        Las Vegas, Nevada 89134

9        MR. CARLO D'ANGELO
         **Carlo D'Angelo, P.C.**
10       100 East Ferguson, Suite 1210
         Tyler, Texas 75702

11
   Court Clerk:
12
         FAITH ANN LAURENTS
13
   U.S. Probation Officer:
14
         CARL TUCKER
15
   Court Reporter:
16
         EDWARD L. REED
17

18

19                    **WITNESS INDEX**

20 GOVERNMENT'S EVIDENCE:

21       Agent James Reed

22             Direct Examination by Mr. Coan....... 24

23             Cross-Examination by Mr. Grasso...... 49

24

25

1          **P R O C E D I N G S**

2          **3:04 P.M. - JULY 5, 2017**

3          THE COURT:  All right, I'll call United States

4    vs. Theodore Robert Wright, No. 6:17-CR-40.  Who is

5    here for the Government?

6          MR. COAN:  Your Honor, good afternoon.  Frank

7    Coan appearing for the United States.

8          THE COURT:  And with you is?

9          MR. COAN:  Special Agent Jim Reed with ATF.

10         THE COURT:  Very good.  And who's here for

11   Defendant?

12         MR. GRASSO:  Good afternoon, Your Honor.

13   Gabriel Grasso, pro hac vice, on behalf of Mr. Wright,

14   who is present on Pretrial Release.  And along with me

15   is my local counsel, Mr. Carlo D'Angelo.

16         THE COURT:  Welcome, Mr. D'Angelo.

17         MS. ANNIS:  Good afternoon, Your Honor.

18         THE COURT:  All right, please be seated.

19              Okay, I understand that there was an

20   initial appearance in Nevada, but not the arraignment,

21   and it would seem that we might as well get that out of

22   the way.

23         MR. GRASSO:  That's correct, Your Honor, there

24   was no arraignment.

25         THE COURT:  All right.  So, Mr. Wright, if you

1   would step up to the podium here, please, and be sworn.

2           CASE MANAGER:  Raise your right hand, please.

3   Do you solemnly swear the testimony you are about to

4   give in this cause now in hearing before the Court

5   shall be the truth, the whole truth, and nothing but

6   the truth, so help you God?

7           DEFENDANT WRIGHT:  I do.

8           THE COURT:  All right, would you state your

9   full name for the record, please?

10          DEFENDANT WRIGHT:  Theodore Robert Wright,

11  Your Honor.

12          THE COURT:  How old are you, sir?

13          DEFENDANT WRIGHT:  I'm 32 years old.

14          THE COURT:  How far did you go in school?

15          DEFENDANT WRIGHT:  High school.

16          THE COURT:  And what is your employment?

17          DEFENDANT WRIGHT:  I have a company that buys,

18  sells, and trades mostly aircraft, former military

19  aircraft.

20          THE COURT:  All right.  And the answer to this

21  one is almost self obvious, but it's on the list.  Are

22  you able to speak and understand the English language?

23          DEFENDANT WRIGHT:  Yes, sir, I am.

24          THE COURT:  And standing next to you is your

25  attorney?

```
 1              DEFENDANT WRIGHT:  Yes.

 2              THE COURT:  And, sir, would you go ahead and

 3    identify yourself again for the record.

 4              MR. GRASSO:  Gabriel Grasso.

 5              THE COURT:  And have you had any problems,

 6    Mr. Grasso, in communicating with your client or do you

 7    have question about his ability to understand English?

 8              MR. GRASSO:  No, Your Honor.

 9              THE COURT:  Mr. Wright, have you currently or

10    recently been under the care of a physician or

11    psychiatrist or hospitalized or treated for any kind of

12    narcotic drug addiction?

13              DEFENDANT WRIGHT:  No, Your Honor.

14              THE COURT:  Right now, today, have you taken

15    any kind of drugs or medicines or pills, either legal

16    or illegal, or consumed an alcoholic beverage of any

17    kind, say, in the last 24 hours?

18              DEFENDANT WRIGHT:  No, Your Honor, I had one

19    drink with caffeine in this morning on the ride over

20    here, and that's all.

21              THE COURT:  Do you have any trouble

22    understanding or hearing me, any medical condition that

23    makes it difficult for you to focus on what I'm saying

24    or listen to what I'm saying?

25              DEFENDANT WRIGHT:  No, Your Honor, loud and
```

1  clear.

2          THE COURT:  And I assume, then, that you have

3  gone over a copy of the Indictment with your attorney?

4          DEFENDANT WRIGHT:  Yes, Your Honor, I have.

5          THE COURT:  And you had an opportunity to

6  consult with your attorney about the Indictment?

7          DEFENDANT WRIGHT:  Yes.

8          THE COURT:  Do you want it read out loud or are

9  you waiving the reading?

10          DEFENDANT WRIGHT:  I will waive the reading,

11  Your Honor.

12          THE COURT:  Counsel, you agree with that also?

13          MR. GRASSO:  Agreed, Your Honor.

14          THE COURT:  Then I ask you how you plead to the

15  charges in the Indictment, guilty or not guilty?

16          DEFENDANT WRIGHT:  Not guilty, Your Honor

17          THE COURT:  All right.  Then under the Speedy

18  Trial Act and our local Speedy Trial Act plan, I will

19  set the case for August 14th of 2017.  The Final

20  Pretrial is August 3rd, 2017, at 3 p.m.  The trial is

21  August 14th of 2017 there in the Tyler Courthouse in

22  Tyler, Texas.

23          All right.  So that takes care of --

24  anything the Government thinks needs to be added to any

25  of that?

1        MR. COAN:  No, Your Honor.

2        THE COURT:  All right.  And anything, counsel?

3        MR. GRASSO:  Your Honor, I was just wondering

4   if -- we've been working with a sealed Indictment -- if

5   we could move to unseal it at this point?

6        THE COURT:  You've seen a copy of it?

7        MR. GRASSO:  I've seen a copy of it, but it's

8   got --

9        THE COURT:  I thought I saw in one of your

10  submissions that there were two other defendants, but I

11  think you said they had already confessed.  Is there

12  any reason to keep it sealed?

13       MR. COAN:  Your Honor, there are three other

14  defendants and they have not been arrested yet.  We

15  would ask that the docket remain sealed at least for

16  the time being to give opportunity to bring those

17  individuals --

18       THE COURT:  Any reason -- I mean, obviously,

19  at some point it has to be unsealed, but is there any

20  reason to have it unsealed at this particular point?  I

21  wanted to be sure you had a copy of it, of course.

22       MR. GRASSO:  No, Your Honor, we have a copy of

23  it, and because I didn't know what the status of the

24  other alleged co-defendants are, I haven't seen the

25  names.  We have a suspicion of who they might be, but

1  we don't have an objection to that, Your Honor.

2          THE COURT:  All right.  If it starts to

3  become -- my guess is that I'm going to get a motion

4  from the Government for a continuance fairly quick

5  because you don't have any other people in here unless

6  you want to try the case more than once.

7              But if it starts to drag on too long and

8  there starts to become some kind of detriment,

9  unfairness to the Defendant over it being sealed, go

10  ahead and raise that again and I'll consider it at that

11  time.

12          MR. GRASSO:  Thank you, Your Honor.

13          THE COURT:  All right.  And you may be seated.

14              Okay.  We are now here at the Detention

15  Hearing and both sides have -- we've had, as I

16  understand it, a hearing in Nevada and the magistrate

17  judge went ahead and determined that the Defendant

18  should be released on conditions.  I have a copy of the

19  Pretrial Services Report from the Pretrial Services

20  Officer that was done there in Nevada and have also

21  received a pair of motions from the Government and a

22  pair of responses from defendant, which I've also read.

23          MR. GRASSO:  Your Honor, if I may?

24          THE COURT:  Sure.

25          MR. GRASSO:  At this point it would be as good

1  a time as any, if I could.  There is a correction to

2  make in my motion.  I just wanted to make sure the

3  Court and the parties --

4          THE COURT:  All right.  And this would be

5  your --

6          MR. GRASSO:  My opposition, the last

7  opposition I filed.

8          THE COURT:  So Document No. 13, what's the

9  correction, then?

10          MR. GRASSO:  On page 5, Your Honor, paragraph

11  G, if I can sort of set the scenario for you, Your

12  Honor.

13          THE COURT:  Okay.

14          MR. GRASSO:  This is a situation where we had

15  the Detention Hearing last week.  I believe either that

16  afternoon or the next day I got the Government's First

17  Motion to Reconsider Detention.  Then I responded to

18  that.  It was sort of like a quick motion that they

19  filed and I filed a quick response.  I thought that

20  would be the end of it.  Then they filed another

21  motion, the second one.  Then I filed my more extensive

22  one, which I believe the Court said 13?

23          THE COURT:  It's Document No. 13.

24          MR. GRASSO:  Then I filed 13 and that was --

25  this document was written over the weekend.

1        THE COURT:  Okay.

2        MR. GRASSO:  And my whole staff was gone, it

3   was just me in the office.  I was meeting with my

4   client and his wife.  I had conversations with them

5   that helped me put this together.  It was just a big

6   rush because I knew I had to get this in by Monday

7   because I spoke to the Court's clerk and the Court's

8   clerk said the Court wanted it by Monday.

9            And in paragraph G, I indicated -- because

10  we had a little bit of a conversation and my

11  understanding was that he was not a captain or had let

12  that expire.  Apparently, after he read it, he called

13  me right away.  And when I sent it to him by e-mail, he

14  said paragraph G is wrong.  Apparently, Mr. Wright has

15  a -- well, I don't really know the laws of captaining a

16  ship or licensing, but if the Court wants to hear the

17  straight scoop as to what he is or what rating he has

18  as a captain, I would rather let him tell it.

19       THE COURT:  Okay.  Well, suffice it to say,

20  then, he --

21       MR. GRASSO:  I had no idea, Your Honor, that

22  he had sailed a boat over the -- not as a captain, but

23  just as an individual person, he knows how to sail a

24  boat over the ocean.  He's apparently tried to sail

25  long distances in the past.  This is a long time in the

1   past.  Apparently, my understanding of Mr. Wright is he

2   likes to collect ratings.  By that I mean he's rated to

3   fly any kind of airplane, he's got a rating for a

4   gyrocopter, he's got a rating for a hot air balloon.

5           This is one of the these things where he

6   likes to take tests and collect ratings for these

7   things, and one of the ratings he has, apparently, is

8   what he calls a paper captain.  He's indicated to me

9   that any time he goes out on boat in the past where the

10  boat had to go anywhere for a distance, he's hired a

11  real captain, but he knows how to captain a boat for

12  all intents and purposes, and I wanted to correct that

13  part.

14          THE COURT:  All right, I'll make a note on

15  that.  Let me, just in terms of who is going to speak

16  first, you've noted that.  I appreciate that, counsel,

17  so we don't have to spend a lot of time on that

18  immediately.

19          Let me bring up the first question.  It's

20  really a matter of law and it's something that I've

21  seen.  There is a whole number -- I mean a big raft of

22  cases on guns and drugs and the presumption.  But the

23  addition of the listing or the reference to that

24  section under the, I guess it's sometimes generally

25  referred to as the terrorism section with this

1   presumption, has an A and a B.  And, counsel, you

2   brought it up in your most recent objection.  I had

3   actually thought of it earlier.  Neither of you have

4   cited any cases.  You've made the logical argument.

5         Defendant makes the logical argument that,

6   well, if 18:2332b(5) -- I'm sorry, (g)(5)(B) is what

7   they are relying on to get this presumption, the

8   Government is relying on to get this presumption, then

9   obviously it can't fly because that's the terrorism

10   section and section (a) has an "and" in there.

11         The Government seems to be arguing that,

12   no -- actually don't address it, but I assume you're

13   arguing that that's just part a list.  Terrorism isn't

14   involved at all, it doesn't have to include other

15   crimes charged, doesn't have to include that part

16   about calculated to influence or affect the conduct of

17   Government by intimidation or coercion or to retaliate

18   against Government conduct.

19         Then that becomes important, of course,

20   under the detention portion where we're looking at 18

21   U.S.C. Section 3142(e), subsection (3), where it says,

22   "Subject to rebuttal by the person, it shall be

23   presumed that no condition or combination of conditions

24   will reasonably assure the appearance of the person as

25   required and the safety of the community if the

1    judicial officer finds that there is probable cause to

2    believe that the person committed -- (C) an offense

3    listed in 2332b(g)(5)(B)," which I was just discussing.

4    And that's a pretty strong presumption.  And the drugs

5    and firearm cases set out in great detail just how

6    strong that presumption is.

7              Anybody have a case that has ever looked

8    at the precise point, whether a listing of 844(i), the

9    one you're dealing with here, by itself, in a non-

10   terrorism case, means I should apply the presumption?

11             Does the Government have any such case?

12        MR. COAN:  Yes, Your Honor.

13        THE COURT:  Where?  What's the cite?

14        MR. COAN:  The cite -- I provided a copy to

15   defense counsel before the hearing and --

16        THE COURT:  Are you talking about the two

17   cases that you just turned in?

18        MR. COAN:  Yes, Your Honor.  We provided two

19   cases to the Court, the *Stanford* case does not address

20   the presumption issue.  The *Mahon* case out of the

21   District of Arizona does and it's an unpublished case

22   from 2009.  The defendant there was charged with a

23   violation of 844(i) --  I

24        THE COURT:  Right, but wasn't he attacking a

25   federal building?

1        MR. COAN:  There was -- I don't recall that it
2   was a federal building.  I recall that it was a public
3   building.  He was not charged with a terrorism offense,
4   though.
5        THE COURT:  Okay, since I got that case a
6   couple of minutes before I came in, I only had a chance
7   to skim it over and -- okay, it does appear that we
8   looked at that.  I don't see where the Court even
9   considered the counter argument raised by Defendant,
10  i.e., that it's not under -- section (A) isn't met,
11  it's not calculated to influence or affect the conduct
12  of Government, which would intimidate or coerce or
13  retaliate against Government conduct.
14        MR. GRASSO:  Your Honor?
15        THE COURT:  Hold on one second.  Let me just --
16        Okay, the Indictment alleges Daniel
17  entered into a conspiracy -- and I'm reading now from
18  2009 Westlaw 2450466, *United States vs. Mahon*.  This is
19  a case out of District Court in Phoenix, Arizona.  And
20  the Indictment alleges that Daniel entered into a
21  conspiracy with Dennis and others to promote racial
22  discord on behalf of the White Aryan Resistance (WAR)
23  by damaging and destroying buildings, facilities, and
24  real property of both the Government and businesses
25  whose activities conflicted with defendant's goals, and

1   they allegedly conspired to deliver a bomb to the City

2   of Scottsdale Office of Diversity and Dialog that

3   exploded on February 26, 2004 injuring Donna Logan and

4   Renita Linyard.

5            And then towards the end it talks about

6   the conspiracy allegedly included mailing instructions

7   and materials for the making of bombs and directions

8   that others should attack the Arizona and Texas power

9   grids if leaders of the White Aryan Resistance,

10  including Dennis, were arrested.

11           So that certainly seems to calculate --

12  or to influence or affect the conduct of Government by

13  intimidation or coercion or to retaliate.  But at least

14  it's closely on point.

15           So that's your best case; right?

16           MR. COAN:  Your Honor, I would tell you that

17  we had similar --

18           THE COURT:  There is nothing wrong with

19  bringing up new theories in a court.  That's my job.

20           MR. COAN:  We had similar results with respect

21  to the research.  The cases interpreting Subsection C,

22  there are very few.  This is the only case that we were

23  able to locate that addresses 844(i) specifically.

24           Your Honor, I'm not standing before you

25  suggesting that the individual charged in the *Mahon*

1   case is the same as Mr. Wright with respect to his

2   motivations and his actions.  I'm simply pointing out

3   that that individual, along with others, is charged

4   with the same arson violation that Mr. Wright has been

5   charged with, which, under our reading of 3142(e)(3)(C),

6   raises the rebuttable presumption.

7          THE COURT:  Okay.  And what about yourself,

8   Mr. D'Angelo?  Any cases going the other way?  I'm

9   sorry.

10          MR. D'ANGELO:  That's quite all right.

11          THE COURT:  Whichever of you wants to speak.

12          MR. D'ANGELO:  I can't find any.

13          MR. GRASSO:  That's fine, Judge.  You know,

14   I've known Carlo for almost 45 years.  We were public

15   defenders together in Broward County back a long time

16   ago.  That's how I know him.

17          Your Honor, I'll admit, when I was doing

18   this on Saturday and Sunday, I looked for cases the way

19   Carlo is right now.  I couldn't find any.  I was mainly

20   looking for circuit cases.

21          Here's how I see it, Your Honor.  3142 is

22   a very specific statute that lists very specific events

23   that, as the Court is well aware, have a rebuttable

24   presumption.  One of those events, it's not 844(i), but

25   it lists the terrorism statute, the 2332b.  That's

1    listed under 3142.  So 844 is not listed under that.

2    It's just a terrorism statute.

3           THE COURT:  Well, wait a minute, wait a

4    minute.  I'm looking at 18 U.S.C. Section 2332b.

5           MR. GRASSO:  Right.

6           THE COURT:  Section (g).

7           MR. GRASSO:  This is 844.

8           THE COURT:  And then subsection (5), and it

9    gets down to "(B) is a violation of -" and goes through

10   a bunch of things.  Then it says "844(i) (relating to

11   arson and bombing of property used under state

12   commerce)".  It doesn't say the terrorism statute.  It

13   says 844(i).

14           Now, when you look at 844(i) -- in other

15   words, there is a listing there of things that are a

16   violation.  To make it a crime of terrorism, it has to

17   also have section (A) in there, I'll agree with that.

18           MR. GRASSO:  I guess my point, Your Honor, is

19   that a presumption of detention under 3142 is not

20   844(i).  It's 2332b.  That act has to occur for the

21   rebuttable presumption to be triggered.

22           THE COURT:  Okay, I understand that argument

23   and that's why I was wondering if the Court -- all

24   right, go ahead.

25           MR. GRASSO:  And here's why I think it should

 1  be looked at that way.  A clear reading -- and maybe

 2  this is why there aren't that many cases on it.  A

 3  clear reading, it says, "Federal crime of terrorism

 4  means an offense that (A) is calculated to influence or

 5  affect the conduct of the Government by intimidation,"

 6  et cetera; and (B) is a violation of" all of these

 7  other statutes, which are all the acts that can take

 8  place.

 9          So, really, the way I read 3142 applying

10  to this is that 2332b is required and this is what's

11  required.  It's not just a question of -- and this is

12  why I think -- if the Court looks at it like this,

13  this is why I think 844(i) doesn't require a rebuttable

14  presumption by itself.  It's because you need either a

15  shooting, an explosion, a fire, all these actual overt

16  acts which is a part of that list.  But then in order

17  to make it a rebuttable presumption, you need the

18  motivation, and the motivation is terrorism,

19  intimidation of the Government.  Just by itself,

20  burning a structure, burning a vehicle, burning

21  whatever, is not rebuttable presumption.  You need that

22  terroristic motivation to bring it to a rebuttable

23  presumption.

24          THE COURT:  And you think (A) needs to apply

25  also, the subsection (A) where it talks about the

```
 1   intimidation or coercion, and then (B)?
 2          MR. GRASSO:  Because it says "and".
 3          THE COURT:  I know, I know, okay.  And it's
 4   not necessary to continue to stand.
 5          MR. COAN:  May I add --
 6          THE COURT:  Sure.
 7          MR. COAN:  Respectfully, we would disagree.
 8   We don't disagree that a federal terrorism offense
 9   creates a rebuttable presumption.  In fact, that's what
10   is stated in 3142(e)(3)(B), "an offense under section
11   924(c), 956(a), or 2332b of this title."
12              We would argue that the federal crime of
13   terrorism as defined in 2332b creates a rebuttable
14   presumption under 3142(e)(3)(B).  In this particular
15   case we're urging the Court to recognize a rebuttable
16   presumption under 3142(e)(3)(C), which simply states,
17   "An offense --
18          THE COURT:  I'm sorry, I think just for record
19   purposes, I think you got the numbers -- you might want
20   to say that again.  I think you got a number off in
21   your recitation there.
22          MR. COAN:  3142(e)(3)(C).
23          THE COURT:  Okay.
24          MR. COAN:  Which states, "An offense listed in
25   section 2332b(g)(5)(B) of Title 18, for which a maximum
```

1    term of imprisonment of 10 years or more is prescribed."
2    Included within that list, as the Court is aware, is
3    844(i).

4         THE COURT:  All right.  It would be nice had a
5    higher court gone through this.  I've looked at it, my
6    law clerk has looked at it.  Evidently counsel on both
7    sides has had at least some look at it.  It does appear
8    to be a case of first impression.  No court has had to
9    deal with this exact precise issue, i.e., is someone
10   charged with basically arson?  And from what I've seen
11   in the Indictment, the charge is not arson of
12   Government property or an attempt to intimidate the
13   Government or coerce the Government or retaliate the
14   Government.  This is an attack on a police station.  I
15   read the Indictment as an attempt to commit insurance
16   fraud and other monetary type crimes.

17        So the question is, when you work your
18   way through all these numbers, in the end, when you get
19   to 2332b(g)(5) that's referred to in the detention
20   statute, the one that sets out the presumption, i.e.,
21   18 U.S.C. section 3142(e)(3), which sets out the
22   presumption, does that section refer to just
23   2332b(g)(5)(B) and that's just a mere listing of
24   statutes and they just chose that as a shorthand to do
25   it?  Or as counsel for the Defendant says, logically,

1  because there is the conjunctive "and" right above it,

2  it has to be only applied to terrorism?

3              And I wouldn't be embarrassed if I was

4  counsel to make the argument either way, like both of

5  you had.  I mean, there is nothing wrong with the two

6  arguments.  In the end, though, I've got to decide.

7              The higher courts do teach me that when I

8  am looking at a statute and there is no guidance from

9  the higher courts on the precise issue, I should just

10  simply read the statute and the words as they are

11  written.  There are two ways that this could have been

12  intended, but I'm not supposed to be looking at intent,

13  I look at the way it's written.

14              And the way it's written, although it may

15  just be for space saving, is that it shall be presumed

16  that no condition or combination of conditions will

17  reasonably assure the appearance of the person and the

18  safety of the community if there is probable cause to

19  believe the person committed an offense listed in

20  section 2332b -- that's a little "b" -- (g)(5)(B) of

21  Title 18, for which a maximum term of imprisonment of

22  10 years or more is prescribed.

23              If we look at that (B), that section (B)

24  that is just talked about, 844(i) is listed.  It says

25  in parentheses "relating to arson and bombing of

1   property".  The detention statute does not refer to

2   section A, it doesn't stop just at section 5.  Reading

3   it as it's written, even though I might say to a law

4   clerk if they wrote that, "I want this written more

5   clearly," Congress wrote it and they intended it to

6   mean what they write, and so I'm going to read it that

7   way.

8           I think there is some additional weight

9   added by the fact that just above that in subsection

10  (B) of the detention statute, it does mention 18 U.S.C.

11  2332b, and it wouldn't make much sense to have that,

12  because 18 U.S.C. 2332b obviously would include the

13  federal terrorism statute, basically all of it,

14  including that subsection or what's listed there in

15  (g)(5)(A) and (B), or any of the offenses set out,

16  whereas (C) makes reference to a specific part of it,

17  i.e., that subsection (B).  And, of course, that is the

18  section in the definitions.  And so to save space,

19  Congress can pick that out, that's a listing in the

20  definitions, so I'm going to find that the presumption

21  does apply.

22          Now, there is also Fifth Circuit case law

23  authority that indicates that when there is a a full

24  hearing, like we're having right now, the presumptions

25  aren't as important as my final determination of all

1    the evidence.  So don't anybody be sandbagged by the

2    fact that I just don't go off on the presumption

3    because now it's a determination.

4               But for purposes of setting the case out

5    and for purposes of the presumption having some weight,

6    as I understand the Fifth Circuit cases, it's not

7    exactly a bursting bubble presumption.  But, on the

8    other hand, assuming Defendant puts in what they can

9    put in, in the response, I would then need to weigh it

10   all, including what the Government puts on and then

11   make my determination.

12              All right.  So, as I understand it, in

13   Nevada the Government was not allowed, or evidently

14   their procedure is that just a proffer of evidence was

15   to be made.  I gathered from both of your motions on

16   the Government's side that you weren't happy about

17   that.  So now you have a chance.  What evidence are you

18   going to put on?

19        MR. COAN:  Thank you, Your Honor.  If the Court

20   will allow, the Government would call Special Agent Jim

21   Reed.

22        THE COURT:  Come on up, sir.

23        COURT CLERK:  Do you solemnly swear that the

24   testimony you are about to give in this cause now in

25   hearing before the Court shall be the truth, the whole

1   truth, and nothing but the true, so help you God?

2           THE WITNESS:  I do.

3           THE COURT:  Go ahead, counsel.

4           MR. COAN:  Thank you, Your Honor.  Your Honor,

5   before I start with the examination, I just wanted to

6   point out for the record that I have provided some

7   contemplated exhibits in connection with Special Agent

8   Reed's testimony this afternoon.  I provided a copy of

9   those exhibits to defense counsel and submitted a

10  courtesy copy for Your Honor's review and have a copy

11  of those six exhibits marked and prepared to tender

12  into the record as those come up during the course of

13  Special Agent Reed's testimony.

14          THE COURT:  Okay.

15          MR. COAN:  Thank you.

16      **SPECIAL AGENT JAMES REED, called by the Government**

17                  **DIRECT EXAMINATION**

18  **BY MR. COAN:**

19  Q.  If you would, state your name for the record,

20  please.

21  A.  James Reed.

22  Q.  And how are you currently employed?

23  A.  I'm a Special Agent with the ATF.

24  Q.  And where are you assigned?

25  A.  Tyler, Texas.

1  Q.   How long have you been with the ATF?

2  A.   Since about January of 2014.

3  Q.   And where were you before that?

4  A.   I worked for the Department of Defense.

5  Q.   In the course and scope of your employment with

6  the ATF, did you become involved in an investigation

7  concerning an individual by the name of Theodore R.

8  Wright?

9  A.   Yes, sir.

10  Q.   And Mr. Wright was indicted by a Federal Grand Jury

11  in the Eastern District of Texas in May of this year;

12  is that right?

13  A.   Yes, sir.

14  Q.   And the charged violations included financial

15  crimes; is that correct?

16  A.   Yes, sir.

17  Q.   And also charges related to arson; is that right?

18  A.   Yes, sir.

19  Q.   With respect to the evidence gathered as part of

20  your investigation, did that include interviews with

21  some of the other individuals charged in the Indictment?

22  A.   Yes, sir.

23  Q.   And did those individuals provide information

24  related to Mr. Wright's conduct?

25  A.   Yes, sir, they did.

1   Q.   All right.  And if you would, just explain a

2   little bit about how the information from those other

3   individuals was gathered in your investigation and what

4   those individuals told you?

5   A.   So there were three other co-defendants.  Two of

6   the other co-defendants, I actually interviewed in

7   person.

8           THE COURT:  Wait, I thought you said that

9   there were three people -- that's what I got, there

10  were three co-defendants and they had already confessed

11  or something in one of your motions.  You are saying

12  there are others still out there?

13          MR. COAN:  I'm sorry if I misspoke or if I was

14  unclear, Your Honor.  There are three defendants --

15  three other defendants.

16          THE COURT:  Right.

17          MR. COAN:  And two of those individuals

18  provided confessions.  All three are at large at this

19  time.

20          THE COURT:  After two of them confessed, you

21  let them go?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  All right, go ahead.

24          THE WITNESS:  Two of those three co-defendants

25  confessed to me in person.  Both of those co-defendants

1  confessed multiple times, meaning on multiple different

2  days.

3          THE COURT:  Were you undercover at the time or

4  did they know who you were?

5          THE WITNESS:  No, they knew very well who I

6  was, sir.

7          THE COURT:  All right, go ahead.

8          THE WITNESS:  The reason for that, it was a

9  long-term investigation and arresting them would have

10 given rise --

11         THE COURT:  Okay.

12         THE WITNESS:  The co-defendants confessed to

13 their activity and to Mr. Wright's involvement in the

14 activity, including very detailed information on how

15 the schemes and criminal activity, which in the

16 Indictment is laid out.  As well as speaking with them,

17 both of them provided evidence that showed messages

18 between themselves and Mr. Wright which detailed the

19 criminal activity, which is in the Indictment, sir.

20 BY MR. COAN:

21 Q.  Special Agent Reed, as you are aware, the two real

22 issues in this particular setting are whether an

23 individual like Mr. Wright presents a flight risk; is

24 that correct?

25 A.  Yes, sir.

1  Q.   And then whether, based on your investigation,

2  that you would conclude, subject to the Court's

3  determination that this individual, this particular

4  defendant, is a danger to others and to the community;

5  is that correct?

6  A.   Yes, sir.

7  Q.   On the issue of flight, if you would, explain to

8  the Court a little bit about what your financial

9  investigation showed regarding Mr. Wright's access to

10 cash and other proceeds.

11 A.   I guess on the issue of flight risk, a hundred

12 percent so, the very essence of flight risk.

13 Mr. Wright has access and ownership of multiple

14 aircraft, helicopters, vehicles, large boats, large

15 amounts of money, including when I arrested Mr. Wright,

16 he had $70,000 in a briefcase, along with two pistols

17 and a car title to a high-end vehicle.

18        Further, on flight risk, Mr. Wright is one of

19 a very small set people in the entire United States

20 who's so highly qualified to fly the aircraft he can

21 fly, which, as was mentioned earlier, involves

22 everything from a small plane to high performance jets,

23 fighter style jets, helicopters.  He has access to his

24 own aircraft, multiple helicopters, other planes, and

25 also a wide network of people who are friendly with

1  Mr. Wright and associates who also have aircraft.

2          He has a boat that he can sail to anywhere in

3  the world with, as well as the skill to sail that boat.

4  Extensive foreign travel with extensive foreign ties in

5  foreign countries.  That's something that the majority

6  of Americans and people I see in my day-to-day work as

7  a Special Agent do not have.

8          He is known to use satellite phones and pay in

9  cash, both which would allow him to travel without a

10  digital or financial trail.  He has numerous holding

11  companies, we found, and he's used these  holding

12  companies to conduct illegal activity.  He has bragged

13  to others that I have interviewed that he has foreign

14  corporations which would give him money outside of this

15  court or the United States jurisdiction.

16          In connection with the charges, he has

17  falsified documents and has instructed others to do the

18  same.  I've interviewed people who have stated

19  Mr. Wright is prepared to live outside the United

20  States, outside the access of law enforcement.

21          And then also on flight risk, we have on

22  Mr. Wright's messages that he has direct business

23  dealings with the Zeta Mexican Cartel, who have a known

24  network and resources to flee and escape.

25  Q.   Thank you, Special Agent Reed.

```
 1            You executed an affidavit in connection with
 2   the proceedings today; is that correct?
 3   A.  Yes, sir, I did.
 4            MR. COAN:  The affidavit has been submitted
 5   into the record, Your Honor.  Because it was filed
 6   under seal, I'm not certain of the docket number for
 7   that particular document.
 8            THE COURT:  Okay, is it in this exhibit
 9   notebook you provided?
10            MR. COAN:  No, Your Honor, that was filed last
11   Thursday.
12            THE COURT:  As part of what, your motion?
13            MR. COAN:  In further support of the Motion to
14   Stay.
15            THE COURT:  Was it filed separately from that?
16            MR. COAN:  Yes, Your Honor.
17            THE COURT:  Okay.  I thought I read something
18   like that.  Okay.  Now, this is sealed.  Have you
19   provided a copy to counsel?
20            MR. COAN:  Yes, Your Honor.
21            THE COURT:  Okay.  Go ahead.
22            MR. COAN:  Thank you, Your Honor.
23   BY MR. COAN:
24   Q.  The Defendant was in possession of two firearms at
25   the time that you made the arrest pursuant to the
```

1  arrest warrant issued in this case; is that correct?

2  A.   Yes, sir.

3  Q.   And do you know him to have been in possession of

4  additional firearms within the recent past?

5  A.   Yes, sir, I do.

6  Q.   And what did your investigation show with respect

7  to his providing firearms to other individuals,

8  especially prohibited individuals?

9  A.   Mr. Wright has provided a firearm that was

10  purchased by himself to a convicted felon.  I know this

11  because we have records that Mr. Wright purchased the

12  firearm.  The firearm was taken from that felon.  That

13  felon said Mr. Wright gave him the firearm.  And I

14  think in the exhibit we have the text messages that

15  show Mr. Wright and that felon negotiating the purchase

16  of that weapon and the delivery of that firearm.

17          Further, I believe there are other exhibits,

18  which are the text messages between Mr. Wright and the

19  same felon in which Mr. Wright is attempting to obtain

20  a firearm from that felon over the interstate commerce,

21  being having a gun mailed through FedEx.  And that even

22  in the same conversations on the first gun I took off

23  the felon, Mr. Wright is asking that felon if he's

24  interested in purchasing a high-powered weapon,

25  including armor piercing ammunition.

1  Q.   During the course of your investigation, did you

2  come upon information indicating that this Defendant

3  had made threats of violence to other individuals?

4  A.   Yes, sir.  I interviewed an individual a couple of

5  days ago.  Another Special Agent also interviewed the

6  same individual separately.  That individual, who is

7  not part of the conspiracy or is not part of the

8  Indictment, indicated that Mr. Wright threatened to

9  kill him a couple of weeks ago.  Specifically, he

10 mentioned things around putting a bullet in this

11 person's head.

12          I've also interviewed another individual

13 associated with this conspiracy who said Mr. Wright has

14 made threats in the past.

15 Q.   Let's talk about the -- let's talk about the

16 individual who you spoke to who claimed to have

17 received a threat from Mr. Wright within the recent

18 past.  What was the nature of the relationship between

19 this individual and Mr. Wright?

20 A.   This individual reports a business relationship

21 with Mr. Wright and that there was a good business

22 disagreement and Mr. Wright then threatened to kill him

23 over that business disagreement.

24 Q.   All right, did you have opportunity to review the

25 Defendant's response brief that included various

1   factual contentions responding to your  affidavit and

2   some of the factual contentions made in the

3   Government's motion?

4   A.   Yes, sir, I did.

5   Q.   Did you have opportunity to review the exhibits

6   that were provided along with that submission to the

7   Court?

8   A.   Yes, sir.

9   Q.   All right.  And after reviewing that, in response

10  to that information, did you identify some specific

11  documents gathered during the course and scope of your

12  investigation which you believe rebut some of those

13  contentions made by the defendant?

14  A.   Yes, sir.

15  Q.   Okay.  And those have been marked for

16  identification purposes as Exhibits 1 through 6; is

17  that correct?

18  A.   Yes, sir.

19  Q.   Okay, so let's walk through those.

20        Now, one of the contentions by the Defendant

21  is that he did not have access to airworthy aircraft.

22  Do you recall that?

23  A.   Yes, sir.

24  Q.   All right, and I'm going to refer you to Exhibit 1

25  and ask you to identify that.

1    THE COURT:  For clarity in the record, since

2  the Defendant may have some exhibits also, do you want

3  to call this Government's 1?

4    MR. COAN:  Certainly, Your Honor.

5    THE COURT:  Otherwise, we wind up with two 1s.

6  So each of these that you're talking about will be

7  Government's 1, 2, 3, and so forth.

8    Now, the copy that you provided me in my

9  book is not marked at all.  And so, if you're putting

10  these in the record, you need to be sure there is a

11  label or mark on them.  They don't all have to be

12  marked, but I was just noticed that mine aren't, so I

13  want to be sure.

14    COURT CLERK:  They have stickers.

15    THE COURT:  All right.

16    MR. COAN:  Your Honor, I have a notebook with

17  the stickers and they are marked as Government's 1

18  through 6 and I'll tender those.  If it's convenient,

19  I'll just tender them orally and then I'll physically

20  hand them to the courtroom deputy.

21    THE COURT:  That's fine.  We'll go through

22  them that way.  But they are marked Government's, so

23  let's refer to them as Government's to keep the record

24  clear later on when the Defendant's show up.

25    MR. COAN:  Okay.

1          THE COURT:  Okay?

2          MR. COAN:  I will.  Thank you, Your Honor.

3          THE COURT:  Go ahead.

4  BY MR. COAN:

5  Q.   If you would, Special Agent Reed, if you would

6  identify what's then been marked as Exhibit 1.

7          THE COURT:  Government's Exhibit 1?

8          MR. COAN:  Government's Exhibit 1, I'm sorry,

9  Your Honor.

10 A.   Government Exhibit 1, the first page shows the

11 multiple aircraft registered and owned and controlled

12 by Wright.  The first is registered under his name, his

13 main company, which shows multiple aircraft, including

14 multiple jets, helicopters and other planes.  On the

15 next page is two other aircraft.  One, which is the

16 Gates Learjet 35, which is specifically mentioned in

17 the Indictment, that is owned by another holding

18 company controlled and associated with Mr. Wright.  And

19 the other is another jet, 805NA, a former NASA jet,

20 also controlled and associated with Mr. Wright.

21 Q.   Let me interrupt just briefly.  So, just for record

22 purposes, according to the FAA, Federal Aviation

23 Administration records, specifically the FAA Registry,

24 there are 14 aircraft registered to Mr. Theodore R.

25 Wright?

1  A.   No, I think that it's a little bit less than that.

2  There are a bunch of N numbers registered, but there

3  are at least 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13

4  registered to him directly, and then another which is

5  under another holding company, which he's a co-owner

6  of, and that was on the next page N316MW.

7  Q.   And again, just to clarify for the record, so

8  Government's Exhibit 1, page 2 of that exhibit, is FAA

9  Registry for a company called NASA 805 LLC; is that

10 correct?

11 A.   Yes, it is.

12 Q.   All right.  And Mr. Wright has ownership interest,

13 is a co-owner of that entity; is that correct?

14 A.   It will be fair to say he's definitely associated

15 with that company and has access to that aircraft.

16 Q.   Okay.  And there are two aircraft that are

17 registered to this NASA 805; is that correct?

18 A.   That is correct.

19 Q.   All right, I'm sorry, continuing on, there are

20 additional records from the FAA in Government's Exhibit

21 1; is that correct?

22 A.   Yeah, the next was the FAA Registry for N316MW.

23 On the next page is the ownership documents for that

24 LLC provided to the FAA, which shows Mr. Wright as a

25 participant and an owner of that LLC.  And the next

1  page is part of the same documents.

2        And then the next page shows that that plane

3  flew on July 2, 2017.  Specifically, it flew from the

4  airport, Texas Gulf Coast Regional, which I'm familiar

5  with is one of Mr. Wright's bases of operations.  He

6  had a hanger out there.  So here's an aircraft that he

7  has ownership in that has flown.  So the argument he

8  has no access to airworthy aircraft, this aircraft flew

9  on July 2, 2017.

10        The next page is another showing that N285RG,

11  which is a helicopter owned by Theodore R. Wright

12  Enterprises, flew on June 20, 2017, another aircraft

13  under the control of Mr. Wright and that flew just a

14  couple of days ago.

15  Q.  Okay, so that's responding to the Defendant's

16  contention that he does not have access to aircraft and

17  that those aircraft are not airworthy; is that right?

18  A.  Yes, sir.

19  Q.  All right.  One of the other contentions made by

20  the Defendant is that he doesn't have any ties to or

21  dealings with non-extradition countries.  And just

22  briefly, what is a non-extradition country?

23  A.  Non-extradition countries, in my research, are

24  countries that do not have formal extradition treaties

25  with the United States Department of Justice or the

1   United States Government.  It's frequently talked to in

2   the criminal world as countries you could go that would

3   make it hard for the United States to get you back if

4   you fled there.

5   Q.   Okay.  Exhibit 2, Government's Exhibit 2, if you

6   would, identify that for the Court.

7   A.   Exhibit 2 is one example.  It's taken from Facebook

8   in which Mr. Wright is talking to another individual.

9   What's important about here is he's bragging about

10  having a meeting with an individual in Algeria and

11  specifically having a meeting with him.  And that

12  individual is in a country, Algeria, which from my

13  research does not have an extradition treaty and is

14  notorious for corruption.

15          Further, in their own motion, they discuss

16  Mr. Wright's business dealings -- or future business

17  dealings with the country of Guinea, a country that's

18  also without an extradition treaty and notorious for

19  its corruption.

20  Q.   One of the other contentions made in the

21  Defendant's brief is that he denies using private

22  aircraft to avoid detection and specifically denies

23  failing to file flight plans.  Do you recall that

24  contention?

25  A.   Yes, sir.

1   Q.   All right, if you would, identify for the record

2   what's been marked as Government's Exhibit 3.

3   A.   This first is a Facebook posting.  In their

4   contention they make that arrival in foreign countries

5   by private plane is a harsher custom standard.  This

6   is Mr. Wright talking to an individual about the VIP

7   treatment that you receive when you fly in on a private

8   jet.  Specifically, it's just a quick stamp, very

9   little inconvenience, and saying it opens doors for you.

10         Further on the flight plans, while it is

11  practice from my talking to the FAA to file formal

12  flight plans, especially for jets, I know of many or a

13  couple of incidents specifically where Mr. Wright did

14  not file a flight plan.  N18FM, the jet that is subject

15  to the Indictment that was burned, flew from Uvalde,

16  Texas, eventually landing in Athens, Texas.  I

17  contacted both the FAA and the Coast Guard Air Marine

18  Operation Centers and they reported that no formal

19  flight plan was filed.

20         Further, N805NA, the large jet, I checked on

21  the flight plan there and there was only a flight plan

22  that was from Canada to where it flew.  It was going to

23  fly to France.  And saw no other flight plans between

24  when it arrived from NASA to Houston and how it got

25  from Houston area, where I physically saw the jet, to

1   Canada.

2          Further, this is a picture taken from a phone

3   of a co-conspirator which shows Mr. Wright's extreme

4   piloting skills.  It means he doesn't even need to land

5   at a formal airport.  This is a picture of him in an

6   aircraft conducting operations on a grass style runway.

7   This means he could easily land in any remote area

8   outside of the influence of the United States

9   Government and not have to go -- and would be easily

10  bypassed because there is no customs people in the

11  middle of a foreign field and passport controls, and he

12  has the skills and ability to do so.

13  Q.   One of the other contentions made by the Defendant

14  in his brief in opposition was that he did not have

15  sailing skills that would be of the type that would

16  present or contribute to a flight risk.  Mr. Wright's

17  counsel has clarified the record somewhat on that

18  point.  But your investigation did confirm that

19  Mr. Wright is, in fact, able to sail or captain or

20  whatever the appropriate characterization would be.

21  He can operate a sailing vessel; is that correct?

22  A.   Yes, sir.  As this exhibit shows, this is from his

23  own charity web page, saying he's an avid sailor and

24  diver and that he lived aboard and cruised a sailboat

25  for nearly two years.

1              On the next page we see some Facebook

2    messages.  Through these, he brags about his sailing

3    skills, including to countries that are non-extradition,

4    hostile to the United States.  As you go through, you

5    see Cuba.  And he also talks about very comfortable

6    sailing all across oceans and living on the boat.  But

7    this is perhaps most important because I've interviewed

8    witnesses who said that Wright has claimed that he has

9    planned to operate the yacht he owns outside the areas

10   of law enforcement in order to specifically bypass law

11   enforcement and customs.

12             He has equipped -- he has told others that he

13   has equipped the boat that he has, which is a large

14   hundred foot-plus boat, to land a helicopter on and

15   this could easily facilitate escape from a helicopter

16   from the land to the ocean, which he would not be

17   subject to -- it would be very hard for law enforcement

18   to reach him if he was in the open water.

19   Q.  All right, just to clean up the record a little

20   bit, so what you're referencing has been marked as

21   Government's Exhibit 4; is that correct?

22   A.  Yes.

23   Q.  And that consists of five pages.  And the first two

24   pages are printed out from a website with the address

25   of *AroundTheWorldForLife,* all one word, *.org*; is that

1  correct?

2  A.   Yes, sir.

3  Q.   All right, and this is profile on that website of

4  T.R. Wright; is that correct?

5  A.   Yes, sir.

6  Q.   Okay.  And those are the first two pages of the

7  exhibit.  And then the last three pages, if you would,

8  just identify the source of those pages.

9  A.   These are Facebook messages from Mr. Wright to

10  various recipients discussing his sailing abilities and

11  boating skills, as well as the countries he visited

12  while sailing those vessels.

13  Q.   All right, on the issue of danger to others in the

14  community, one of the topics that has been discussed

15  already in your testimony is providing a firearm to a

16  felon.  And if you would, just identify for record

17  purposes what is Government's Exhibit 5?

18  A.   Government's Exhibit 5 is three strings of

19  messages.  They are not in chronological order, but

20  the first string starts on December 1, 2016.  This is

21  when Mr. Wright is talking with a co-conspirator, a

22  convicted felon, and purchasing a firearm for him.

23  They discuss purchasing the firearm.  Mr. Wright, as I

24  mentioned earlier, offers to sell another firearm to

25  this individual, including armor-piercing ammunition.

1  Then later on in the string they agree how Mr. Wright

2  coordinates the delivery of the firearm to this

3  individual.  And as I stated earlier, I recovered the

4  firearm from this individual, a felon.  This individual

5  told me he received the firearm from Mr. Wright, and I

6  verified that Mr. Wright did purchase the firearm.

7          The next string begins from on or about June

8  18, 2015, and Mr. Wright is coordinating the purchase

9  of a firearm from this individual, a felon.  He

10  specifically says he can't buy anything in Vegas, he

11  has to be a Nevada resident and register in Clark

12  County, and he wants this individual, a felon, to ship

13  it to him.  And he even says:  If they ask you what's

14  inside the box, tell them it's not a firearm.

15          Then the following section is another message.

16  This is on or about February of 2016 when Mr. Wright is

17  talking about that he has five rifles, handguns, and

18  15,000 rounds of ammo on the boat, and that he also has

19  four other pistols in other locations.

20          You know, throughout these messages, you see

21  that Mr. Wright has violated -- or evidence shows that

22  Mr. Wright has violated multiple federal firearms laws,

23  as well as has access to weapons, which to me is

24  especially concerning since I interviewed an individual

25  who says that Mr. Wright threatened to kill him over a

1    business deal.

2    Q.   Also within the Defendant's submission, there was

3    a denial of any connection to or dealings with the

4    Mexican cartel Los Zetas.  Do you recall that

5    contention?

6    A.   Yes, sir.

7    Q.   All right.  And if you would, identify what has

8    been marked as Government's Exhibit No. 6.

9    A.   This is a text message string from the same

10   co-conspirator.  The defense made an assertation that

11   they were joking.  I read this very clear is he's not

12   joking.  In fact, he says -- and this is Mr. Wright's

13   phone -- "Meeting with the Zeta and drug cartel and

14   exchanging $30,000 for some aircraft logbooks they are

15   holding hostage.  Long story, but that's the basic gist

16   of it."  They discuss what they are getting into.

17        Mr. Wright points out the news article

18   referring to the seizures of those helicopters.  Even

19   at the end he says, "I would still pack, but I do

20   everywhere", referring that the co-defendant or

21   co-conspirator bring a weapon to do business with these

22   individuals.

23        I am aware that this helicopter was seized

24   from the Zeta drug cartel and this appears to be very

25   clear to me that Mr. Wright was negotiating directly

1   with the Zeta drug cartel for these logbooks, which

2   were not seized by U.S. law enforcement and in

3   possession of what's been reported to me as Zeta drug

4   cartel.  In his own words, text messages says he's

5   meeting with them and they have a serious discussion.

6   My read of this is he's not joking at all.

7            And the person interviewed, I've interviewed

8   the person who Mr. Wright is talking to in text

9   messages, and he did not believe they were joking,

10  either.  And in my understanding and work, the Zeta

11  drug cartels are the most notoriously violent drug

12  trafficking organizations in the world with

13  nation-state level access to weapons and technology.

14           MR. COAN:  Your Honor, I would tender into the

15  record Government Exhibit Nos. 1 through 6 if there is

16  no objection.

17           THE COURT:  It's my understanding that the

18  same Rules of Evidence that would apply in trial don't

19  apply in this kind of hearing, and obviously admission

20  for the purpose of this hearing only doesn't make them

21  admissible anywhere else.  Are there any objections?

22           MR. GRASSO:  No, Your Honor.

23           THE COURT:  All right.  Then with those

24  caveats, I will admit them for consideration by the

25  Court for purposes of this hearing only.

```
 1              MR. COAN:  Thank you, Your Honor.
 2              THE COURT:  That would be Government's Exhibit
 3   1 through Government's Exhibit 6.
 4   BY MR. COAN:
 5   Q.  Special Agent Reed, does Mr. Wright live in the
 6   Eastern District of Texas?
 7   A.  Not to my knowledge.
 8   Q.  Based on your investigation, does he have any ties
 9   to the Eastern district of Texas?
10   A.  Not to my knowledge.
11   Q.  Do you recall what address Mr. Wright provided to
12   the United States Marshal Service following his arrest
13   in connection with this case?
14   A.  I believe that was the Kemah address is what I saw.
15              THE COURT:  I'm sorry, what address?
16              THE WITNESS:  It's down in Kemah, Cien Road.
17              THE COURT:  What state?
18              THE WITNESS:  Texas, in Kemah.
19              THE COURT:  Oh, Kemah, okay.
20   BY MR. COAN:
21   Q.  Do you recall what the address is or you just
22   recall the road and the city?
23   A.  I do not recall off the top of my head.
24   Q.  But you recall an address in Kemah, Texas that was
25   provided to the Marshal Service; is that right?
```

1  A.   Yes, sir.

2  Q.   All right.  And are you familiar with that address

3  as part of your investigation?

4  A.   Yes, sir.

5  Q.   And what is that, is that a house?

6  A.   No, sir.

7  Q.   What is that?

8  A.   It's an office building in which there's various

9  offices.

10  Q.   Okay.  Again, to your knowledge, based on your

11  investigation, does Mr. Wright have a home somewhere in

12  the United States?

13  A.   To the best of my knowledge, Mr. Wright does not

14  himself have a permanent home in the United States.

15  Anywhere that I've been able to see where he

16  basically -- you know, your typical home.  From talking

17  to people, Mr. Wright frequently lives in hotels.  In

18  fact, we arrested him at a hotel.  On the yacht boats

19  and different places off and on.  I guess that's the

20  best of my knowledge.  Trump Towers would probably be

21  the closet thing he has to a home.

22  Q.   And that's the Trump Hotel in Las Vegas, that was

23  where he was arrested in connection with this case; is

24  that right?

25  A.   Yes, sir.

1  Q.  And were you able to determine how long Mr. Wright

2  had been staying at the hotel at the time of your

3  arrest?

4  A.  I believe he had been there for that time for

5  around a month, I believe that's what we heard from the

6  people who indicated how long he had been renting there.

7  But I do know he had previously been there in the past,

8  but had just recently come to Las Vegas.

9          THE COURT:  Wait.  You said you knew he had

10  been there in the past, but just recently came to Las

11  Vegas.  That's contradictory.  What do you mean?

12          THE WITNESS:  It's been a place he's used off

13  and on through my investigation as a residence of sorts.

14          THE COURT:  Okay.  So he had been there

15  previously, but this day it had been about a month is

16  what you understood?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Okay, go ahead.

19  BY MR. COAN:

20  Q.  And I believe you mentioned earlier, during your

21  investigation, you were able to determine that

22  Mr. Wright has traveled internationally a good bit over

23  the past five, six years; is that right?

24  A.  Yes, sir.

25  Q.  What's the frequency of that international travel,

1  if you were able to determine  any type of pattern

2  during your investigation?

3  A.   It would be fair to say it's much more extensive

4  than your average American and includes both commercial

5  flights and then also private airplane flights to

6  Europe and the Near East -- Turkey, different places.

7  Basically mainly to Europe.

8  Q.   And what were you able to determine about the

9  length of stay on those trips that you are aware of

10 that came up during the investigation.  Were they

11 extended stays or a few days or what were you able --

12 A.   I would say it varies, but Mr. Wright, it's much

13 more than the one-off vacation that the average person

14 may take or the every-now-and-then business trip that

15 your average individual would deal with.  Mr. Wright,

16 from what we've been able to put together, sometimes

17 will, you know, return to the United States and in a

18 couple of days later fly back over and do it again.

19 It's very frequent travel to overseas.

20        MR. COAN:  Your Honor, I'll pass the witness.

21        THE COURT:  Counsel?

22        MR. GRASSO:  Thank you, Your Honor.

23               **CROSS-EXAMINATION**

24 **BY MR. GRASSO:**

25 Q.   Agent Reed, my name is Gabe Grasso.  I represent

1  Mr. Wright in this case, along with Carlo D'Angelo, and

2  I'm going to ask you some questions and try to stay

3  with sort of the issues that you touched upon in your

4  direct examination.

5  A.   Yes, sir.

6  Q.   Let's talk about the three co-defendants.

7  Obviously, I know the Government is trying hard not

8  to -- or obviously just doesn't want the names to come

9  out.  That's why the Indictment is still sealed.  But

10  let's talk about the -- you indicated that one of these

11  co-defendants is a convicted felon?

12  A.   Yes, sir.

13  Q.   Is there a co-defendant that's associated with

14  Hawaii?

15  A.   Yes, sir.

16  Q.   Okay, is that co-defendant also a convicted felon?

17  A.   Yes, sir.

18  Q.   Is he a registered sex offender?

19  A.   Yes, sir.

20  Q.   Okay.  So there is one co-defendant who is a

21  convicted felon and there is another co-defendant who

22  is also not only a convicted felon, but a registered

23  sex offender in Hawaii?

24  A.   Yes, sir.

25  Q.   Okay, and these are both people who you have talked

1  to in this case?

2  A.   Yes, sir.

3  Q.   These are the two people who confessed?

4  A.   Yes, sir.

5  Q.   And these two people are the people who are

6  providing you information that you've related to the

7  Court?

8  A.   Yes, sir.

9  Q.   Okay.

10  A.   Well, what do you mean by -- I'm sorry, I mean,

11  provided information, yes, that was used, that I talked

12  about earlier in the confessions, yes, sir.

13  Q.   You are a federal agent, you have these people who

14  are both convicted felons, one of them is a registered

15  sex offender, and you are asking them questions and

16  they are giving you answers, and some of those answers

17  you related to the Court?

18  A.   Yes, sir.

19  Q.   Now, with respect to the individual in Hawaii, he's

20  related to one of the counts in the case; right?

21  A.   Yes, sir.

22  Q.   Okay.  When you arrested the other individual, not

23  the Hawaii person -- and we'll call him R.F.; is that

24  fair?

25  A.   Yes, sir.

1  Q.   Okay, R.F..  When you arrested R.F., that sort of

2  like -- was that a raid situation where you sort of

3  came into his house?

4  A.   Yes, sir.

5  Q.   Okay.  When you came into his house, did you

6  discover an amount of drugs in the house?

7  A.   No, sir.

8  Q.   There were no drugs in the house?

9  A.   My recollection is there might have been residue,

10  but that was what we -- that was all I could recall was

11  maybe minor amounts of residue.

12  Q.   Did somebody else handle the drug part of it, maybe

13  you didn't have all the information?

14  A.   My knowledge is -- I did not search the house, but

15  the people who searched said there was not enough drugs

16  to take.

17  Q.   Okay.

18  A.   Which in my experience, doing drugs as one of my

19  main jobs, it means it was probably a residue or tiny,

20  tiny bit that you couldn't probably even package up.

21  Q.   But you're not sure?

22  A.   I mean, I'm fairly certain there was no more than

23  that, a small amount of residue.

24  Q.   And this individual, at that time when you spoke to

25  him, he confessed to his involvement -- allegedly

1  confessed to his involvement in this conspiracy?

2  A.   Yes, sir.

3  Q.   And he wasn't arrested?

4  A.   He was not arrested.

5  Q.   And at this time do you know where he is?

6  A.   I do not.

7  Q.   Okay.  And the other person in Hawaii, he confessed

8  allegedly to the conspiracy and he was not arrested?

9  A.   Yes, sir, that's correct.

10  Q.   Do you know where he is?

11  A.   I believe he's still in Hawaii.

12  Q.   Okay.  Let's talk about these points that you made

13  with respect to Mr. Wright's ownership of planes and

14  how you are contesting or the Government is contesting

15  that Mr. Wright indicated in his response that he

16  doesn't have access to any airworthy aircraft or any

17  aircraft at this time; correct?  That's what we're

18  talking about?

19  A.   Yes, sir.

20  Q.   These planes that are on the list in I guess it's

21  Exhibit 1, it's an FAA Registry.

22       THE COURT:  Government's Exhibit 1?

23       MR. GRASSO:  Government's Exhibit 1, yes.

24  Well, in Government's 1, Your Honor, I'm a little

25  confused.  Is Government's 1 -- it says 1, 2, 3, 4, all

1  through 6, is that how we're going to call it, or is

2  this whole thing Government's 1?

3          THE COURT:  I understood each of those

4  exhibits was 1, 2, 3, 4, 5, and 6.  Each one of them

5  have Government in front of it because should you want

6  to put in Defendant's, I don't want the record saying 1,

7  1, 2, 2.

8          MR. GRASSO:  Understood.  So Government's 1.

9  We're talking about Government's 1.  Thank you, Your

10 Honor.

11         THE WITNESS:  Yes, sir.

12 BY MR. GRASSO:

13 Q.  Although it says here, "Updated each federal

14 working day at midnight," do you know actually how the

15 update system works with these tail numbers and the

16 aircraft?

17 A.  I'm obviously not an expert on FAA, but my

18 understanding in talking with them is that you go

19 through a process, you fill out -- you send documents

20 to the FAA, it goes through the process.  When they

21 have finished their update process, they post this, you

22 know, for the public to look at, sir.

23 Q.  So, in other words, this is a situation where, if

24 somebody sells a plane or a plane changes hands, there

25 is a paperwork and licensing and whatever process that

1   takes place, and once that's finished, then it's

2   updated on the FAA website?

3   A.   That's my understanding, yes, sir.

4   Q.   And you understand that Mr. Wright's business is to

5   buy and sell aircraft?

6   A.   Yes.  Well, that's one of his things I know he does

7   conduct, yes, sir.

8   Q.   Right, and he conducts -- obviously, he's not an

9   aircraft -- for lack of a better term, it's not like he

10  has these in a giant hangar, that he collects these

11  planes.  His business is to buy a plane, sell it -- buy

12  at action like we showed with the helicopter that was

13  bought from the Treasury Department; right?

14  A.   My understanding of Mr. Wright's involvement is he

15  does broker some airplanes, but a lot of the other

16  airplanes he does keep for himself or puts in another

17  holding company, which he has a co-interest in.

18  Q.   So you're saying that he doesn't buy and sell all

19  these airplanes?

20  A.   He does buy and sell airplanes.  But as you

21  mentioned, you're saying does he sometimes resell them?

22  Yes.  Does he sometimes not resell them?  The answer is

23  also yes to that.

24  Q.   Okay, so let's talk about No. 1, the Eurocopter

25  France.  To your knowledge, do you understand -- do you

1   understand that he sold that airplane?  He sold that

2   helicopter?

3   A.   I have not seen FAA documentation on that sale.

4   Q.   Well, like you said, he buys and sells every day,

5   so there is a process of buying and selling and a

6   process of paperwork.  You don't have any -- let me ask

7   it this way:  You don't have any information that tells

8   you that he hasn't sold that helicopter?

9   A.   I have no information that tells me he has not sold

10  helicopters.  I have no information that he has sold

11  the helicopter.

12  Q.   Sold it or not sold it?

13  A.   I have -- I have no information that the helicopter

14  has been sold to anyone.

15  Q.   And you don't have any information that it hasn't

16  been sold?

17  A.   That's correct, only that the FAA has it registered

18  to Theodore Robert Wright Enterprises, Inc.

19  Q.   Correct.  He purchased that helicopter months ago.

20  To your knowledge, have you been able to -- this is --

21  we're just getting started with this investigation.  To

22  your knowledge, is it possible that he sold this

23  helicopter?

24  A.   It is certainly possible that that helicopter has

25  been sold.

1  Q.  Okay, the Cessna 550, same question:  Could be

2  sold; correct?

3  A.  Yes, it could have been, sure.

4  Q.  Do you have -- instead of going through each one,

5  do you have any information to show that he has current

6  access to any of these aircraft, apart from just the

7  FAA registration?

8  A.  I would say yes, sir, I do on --

9  Q.  We'll talk about that one on the next page.

10 A.  On this page, yes, sir, I do.  Currently, there is

11 a dispute over these helicopters.  But from my

12 understanding on those, he still has claims on those or

13 has associates that he would have access to those

14 helicopters.

15 Q.  But the dispute has to do with buying and selling;

16 right?  There is people who are willing to buy it and

17 there may be a dispute and that's the state of these

18 aircraft?

19 A.  To my knowledge -- yes, to my knowledge, those

20 aircraft, some of the -- I can't say exactly which

21 Gazelles right off the top of my head, but some of the

22 Gazelles are in the United States and, you know, there

23 is a dispute over the aircraft, but Mr. Wright would

24 have access to those aircraft if he had possession of

25 them.

1  Q.   Well, okay.  So you don't have any information that

2  he has possession of --

3  A.   He does not have possession of the helicopters at

4  this time, but he could get possession of those

5  because, basically, they're -- like you mentioned, they

6  are not in his physical -- it's not like a car you

7  drive around, they are at an airport somewhere.  He

8  just has to go and show up and get the aircraft.

9  Q.   He's probably a good enough pilot that he could go

10 to an airport right here, the closest airport, and

11 maybe steal an airplane, how about that?

12 A.   He easily could do that, yes.

13 Q.   He easily could do that?

14 A.   Yes.

15 Q.   Okay.  So it's not a question of whether he owns

16 these planes or not.  He could swipe a plane any

17 minute?

18 A.   Yes, sir, and that's why he's the most extreme

19 flight risk I've ever seen.  He could get in any

20 aircraft, whether it be a small prop plane to a high

21 performance jet.  I believe he even has almost

22 commercial certification, fighter jets, and could, yes.

23 And that's why it is such a -- he is such an

24 extraordinary flight risk.

25 Q.   Exactly, that's why he's sitting right here today;

1  right?

2  A.   What do you mean?

3  Q.   He is such a flight risk because he's sitting right

4  here?

5  A.   He is an extreme flight risk, sir.

6  Q.   But the guy that you -- R.F., one of the defendants

7  in this case that you had custody of, where is he?

8  A.   I do not know, sir.

9  Q.   He's a flight risk; right?

10  A.   No, not in the same way Mr. Wright is.

11  Q.   Well, who's here and who is not here?

12        I'll withdraw the question.

13        So, in other words, there is one plane, of all

14  these planes that we're talking about -- okay, for

15  example, like the Gates Learjet on the next page, you

16  know that plane is in France; right?

17  A.   To my best -- yes, the last time I was able to

18  track that plane, it was in France

19  Q.   Okay.  And the Grumman American that's right below

20  that, do you know that that plane is basically sitting

21  in an airport in a state of disrepair, it's not

22  airworthy?  Do you know that?

23  A.   I believe it's airworthy since it has flown and has

24  made a flight plan to fly overseas.

25  Q.   When was this?

1  A.   This was probably a couple of months ago.

2  Q.   Okay.  So, since then, do you have any information

3  that that plane could have been damaged and is actually

4  not airworthy right now?

5  A.   That's big news to me, sir.

6  Q.   Okay.  Now, you talk about the Cessna 500, this

7  Checkmate Cessna 500 on the next page; right?

8  A.   Yes, sir.

9  Q.   This Checkmate company, there's co-owners, Martin

10  Wolf and Theodore Robert Wright?

11  A.   Yes, sir.

12  Q.   Okay.  And then the flight plan, it flew from New

13  Orleans to Jackson, Texas; right?

14  A.   Yes, sir.

15  Q.   And that plane flew on Sunday, July 2nd?

16  A.   That's what the information shows, yes, sir.

17  Q.   Do you know where Mr. Wright was Sunday, July 2nd?

18  A.   No, sir.

19  Q.   Okay.  So do you know whether -- we're talking

20  about last weekend; right?

21  A.   Yes, sir.

22  Q.   You're actually telling the Court that Mr. Wright,

23  who's on an electronic monitor as he sits right here,

24  that you don't know -- that you don't think you would

25  have known if Mr. Wright had gotten into a plane in New

1  Orleans, Louisiana and flown it to Jackson, Texas?

2  A.   I never made a contention Mr. Wright flew that

3  plane.

4  Q.   Okay, so apparently somebody else is in possession

5  of this plane?

6  A.   Someone else has access to the plane, as well.

7  Q.   Most likely Mr. Martin?

8  A.   Mr. Wolf, yes, sir.

9  Q.   Mr. Wolf, Martin Wolf; right?

10  A.   Yes, sir.

11  Q.   Okay, his partner?

12  A.   Yes, sir.

13  Q.   Do you know what the arrangements are between

14  Mr. Wright and Mr. Wolf regarding who actually owns

15  that plane?

16  A.   I do not.  The only documentation I have is that

17  Mr. Wright, according to the FAA, has a control in that

18  aircraft.

19  Q.   In the corporation?

20  A.   Yes, sir.

21  Q.   Right?

22  A.   Yes, sir.

23  Q.   In the corporation that owns that aircraft?

24  A.   That's what the documents show.

25  Q.   Mr. Martin is flying it around the southern United

1  States right now, just a couple of days ago?

2  A.   Yes, sir.

3  Q.   Okay.  And do you understand that Mr. Wright is

4  required by Pretrial Services to remain in the District

5  of Nevada at all times unless he's coming to court here?

6  A.   Yes, sir.

7  Q.   And he's on an electronic monitor for that?

8  A.   Yes, sir.

9  Q.   Do you know how that works?  For example, if he

10  were to either cut it off or go somewhere else, they

11  would find out right away?

12  A.   To my research, that's not true, sir.  In fact,

13  I've researched many cases in which someone has removed

14  their monitor.  A famous case recently was Mr. Lyle

15  Jeffs.  He removed his GPS tracker without severing the

16  connections that would alert officials.  They say he

17  likely used olive oil, fairly easy to do.  Research

18  shows it's very easy to do, take it off.  I'm aware of

19  that.

20         I'm also aware of cases where you can remove

21  it and it takes some time for the law enforcement to

22  respond.  I've actually researched Pretrial Services.

23  They say it would take some time.  The extreme risk of

24  Mr. Wright is he could remove his GPS monitor within

25  minutes, be it Las Vegas Airport; and within an hour or

1  about an hour or so time frame be in Northern Mexico,

2  way before any law enforcement would ever be able to

3  respond.

4  Q.   Do you know if Mr. Wright has any aircraft at

5  North Las Vegas Airport?

6  A.   I do not know, no, sir.

7  Q.   Do you know the route that he took to get here

8  today?

9  A.   No, sir.

10  Q.   Obviously, you saw him in Las Vegas; correct?

11  A.   Yes, sir.

12  Q.   And now he's here, so he must have gotten here

13  somehow?

14  A.   Yes, sir.

15  Q.   And you know he drove here?

16  A.   Yes, sir.

17  Q.   Do you know that he drove on the 40 instead of the

18  10 so he wouldn't go near Mexico, so that nobody would

19  suspect that he might be going to Mexico?

20  A.   No, sir, I did not know that.

21  Q.   That he made that drive like that?

22  A.   No, sir, I did not know that.

23  Q.   This helicopter, the last page of Exhibit 1,

24  apparently at some point -- it's a helicopter that's

25  owned by a company -- well, it's listed as having been

1  owned by Mr. Wright, but do you know if it's been sold

2  to a tour company?

3  A.   I do not know that, sir.

4  Q.   Do you have any information that Mr. Wright flew

5  this helicopter on Tuesday, June 20th?

6  A.   No, sir, I do not.

7  Q.   Okay.  And it seems to be a very short little

8  flight, correct, didn't really go anywhere?

9  A.   Yes, sir.

10 Q.   Okay, let's talk about the -- you talked about

11 firearms in your direct examination.  With respect to

12 the firearms, do you know that Mr. Wright has a Texas

13 concealed carry permit?

14 A.   Yes, sir.

15 Q.   And in fact, you came to my office in Las Vegas to

16 return the two firearms which were seized when he was

17 arrested?

18 A.   Yes, sir, I returned them to you.

19 Q.   And you understood that those firearms were

20 returned to my office because it was my job as officer

21 of the Court to collect all the firearms that

22 Mr. Wright had and keep them for safekeeping while this

23 case is pending?

24 A.   Yes, sir.

25 Q.   Okay.  Did you see any documentation that I

1  provided to the Court listing the firearms and saying

2  that they were handed over to me on a certain day?

3  A.   No, sir.

4  Q.   Okay.

5       MR. GRASSO:  Well, Your Honor, I could submit

6  that, correct, as an exhibit?

7       THE COURT:  If you want.

8       MR. GRASSO:  May I have a minute, Your Honor?

9       *[Pause]*

10 BY MR. GRASSO:

11 Q.   Oh, let me just put it this way:  Did you read the

12 conditions of the Pretrial Services Report?

13 A.   No, sir.  I do know he's not able to possess

14 firearms like we discussed.

15 Q.   Right.  And I'm reading from the Pretrial Services

16 Report.  It says that -- let me find it -- No. 9,

17 "Defendant shall refrain from possessing a firearm,

18 destructive device, or other dangerous weapons, and

19 any firearms shall be removed from the defendant's

20 possession within 24 hours of release from custody,

21 and the defendant shall provide written proof of such

22 to Pretrial Services or the supervising officer."

23 Right?

24 A.   Yes, sir, that's what it says.

25 Q.   So the 24 hours has passed; right?

1  A.   Yes, sir.

2  Q.   Okay.  With respect to Exhibit 2, where you

3  indicate that there is a conversation -- some type of

4  Facebook conversation between Mr. Wright and another

5  person, where he says things like, "How would you

6  distribute it in Africa?"

7           "I have a great connection there."

8  A.   Yes, sir.

9  Q.   "I may have some connections in Colombia.  The

10 largest dairy farmer and distributor in Algeria."

11          Correct?

12 A.   Yes, sir.

13 Q.   Okay.  Do you know what he was talking about here?

14 A.   Yes, sir.

15 Q.   What is that?

16 A.   He was talking about distributing an energy drink,

17 I believe, that he was a co-owner with some individuals

18 from France.

19 Q.   That the one that's called Up Energy?

20 A.   Upshot Energy, I believe.

21 Q.   Or something?

22 A.   That's my understanding, yes, sir, something close

23 to that.

24 Q.   So he wasn't talking about planes or firearms or

25 anything like that, it was just about distributing an

1  energy drink in different parts of the world?

2  A.   Are you talking about why this is in here?

3  Q.   No, no, I'm saying, in these conversations he's

4  talking about distributing an energy drink?

5  A.   Yes, sir, he's talking about the great connection

6  he has in Algeria in reference to the energy drink

7  distribution.

8  Q.   Right, he says, "I Have a great connection there."

9  And then it says, "The largest dairy farmer and

10  distributor in Algeria"?

11  A.   Yes, sir.

12  Q.   Right?

13  A.   Uh-huh.

14  Q.   That's his great connection is a dairy farmer;

15  right?

16  A.   Yes, sir, and you claim there was no connections or

17  ties to extradition countries when, clearly, this is

18  the point I was making earlier on this was he, his own

19  words, he has connections to countries.  So that's what

20  I'm saying.  In his own words, he said, "I have a great

21  connection there."

22  Q.   Right, if I can grab my opposition.  Here, I have

23  it here, sorry.  The actual -- I just want to go to my

24  opposition and go to --

25  A.   Yes, sir.

1  Q.   "Wright has told others that he has ties to

2  non-extradition countries.

3          Okay, now, I'm just taking this from what the

4  Government wrote.

5  A.   Uh-huh.

6  Q.   Wright has told others not that he has ties in

7  non-extradition countries, but ties to non-extradition

8  countries.  So, could that be interpreted as him having

9  ties to the governments of these countries since he

10 deals with lighter aircraft and things like that?

11 A.   It could, but I don't interpret it that way.

12 Q.   Okay, well, I'm just saying it could be interpreted

13 that way?

14 A.   Yeah, I mean --

15 Q.   Do you have -- do you have any information that he

16 has any ties to the government of Algeria?

17 A.   Not to my knowledge, sir.

18 Q.   Or to the government of Colombia?

19 A.   Not to my knowledge, sir.

20 Q.   But apparently he has ties to the government of

21 France because he's bought planes from France; right?

22 From sub-companies that deal planes --

23 A.   That's my understanding, yes, sir.

24 Q.   And I believe in my motion I wrote that he was

25 trying to buy these 24 Israeli trainer jets to sell

1  some of them to the government of Guinea?

2  A.   Yes, sir.  And on that, Guinea is a non-extradition

3  country.  So, by his own admission, yes, he would have

4  ties to a non-extradition treaty country.

5  Q.   Right, but you don't know what stage that sale was

6  done, if he's just trying to get Guinea to buy them or

7  if he knows people there; you don't know that?

8  A.   No, sir, I don't.

9  Q.   Okay.  So, in the other part, Exhibit 3, these are

10 where we talk about getting into another country.  I

11 just want to make one little point on here on

12 Government's Exhibit 3.  In the middle of it, it says,

13 "It's VIP treatment everywhere, no line.  Customs comes

14 to you."  It says, "Thank you very much.  Just let us

15 quickly stamp your passport."  Right?

16 A.   Yes, sir.

17 Q.   So, clearly, there is Customs process that takes

18 place on these private jets?

19 A.   To my understanding, there is at some airports,

20 yes, sir.

21 Q.   Okay.  So, in other words, it appears that there is

22 a Customs process that you'd better have a passport or

23 maybe you're not getting into that country; right?

24 A.   In some places, yes, sir.

25 Q.   You could always land on a dirt road; right?

1  A.   Yes, sir.  In fact, that's again why Mr. Wright is

2  so exceptional compared to the average defendant

3  because the average person can't land a plane on a dirt

4  road.  They'd crash and burn in a fiery heap.

5  Q.   Well, the average person can't fly a plane.

6  A.   That's correct, yes, sir.

7  Q.   What I'm saying is, do you have any information

8  that Mr. Wright has ever landed planes surreptitiously

9  on dirt roads or anywhere else?

10  A.   I have a picture of him operating an aircraft on a

11  grass runway.  I don't know the circumstances

12  surrounding that.

13  Q.   This is that picture.

14  A.   Yes, sir.

15  Q.   Do you have any -- do you have any information --

16  this appears to be a pretty advanced airplane; right?

17  A.   Yes, sir.

18  Q.   It doesn't appear to be -- well, let me ask.

19  A.   I believe it's actually the Gates Learjet.

20  Q.   Learjet, okay.  So you understand that a Learjet

21  doesn't land on grass; right?

22  A.   I do not know.  All I know is that this plane is

23  operated -- in the text message, references operating on

24  a grass runway.

25  Q.   Do you have any idea whether this is just part of

1  the airport, that he's actually on a runway as this

2  picture is taken?

3  A.   I do not, sir.

4  Q.   I mean, could you see where somebody can be sitting

5  at an airport and out the window you could see grass?

6  It doesn't mean he's on grass; correct?

7  A.   That could be, yes, sir.

8  Q.   Do you know the landing speed of a Learjet?

9  A.   No, sir.

10 Q.   That it can be as high as 150 miles an hour, 125

11 miles an hour?

12 A.   The only information I have is that he was talking

13 about operating an airplane on a grass runway.

14 Q.   Not the Learjet?

15 A.   In this picture he was operating -- I don't know if

16 it was a Learjet, I can't say it's a Learjet, but he

17 was talking about operating on a grass runway.

18 Q.   Okay.  I'm not going to spend any time on the boat

19 stuff because we've cleared that up.  Mr. Wright is a

20 qualified seafarer, I guess you could say.  He can

21 probably captain a boat somewhere.

22       Now, do you know that there is a boat here in

23 Texas that he owns?

24 A.   Yes, sir.

25 Q.   Do you know where it is?

1  A.   It's in Kemah, Texas.

2  Q.   Have you been on that boat?

3  A.   I've never been on that boat.

4  Q.   By one it, I mean like searched it or anything?

5  A.   No, sir.

6  Q.   Okay.  Do you know whether that boat is seaworthy

7  or not right now?

8  A.   I know it's in the water right now.

9  Q.   So you don't know if it's seaworthy or not?

10  A.   I have no -- I have no understanding at all.  I can

11  see that it is in the water currently.

12  Q.   Or if the engines work things like that?

13  A.   I don't have any knowledge on that, sir.

14  Q.   Okay.  And obviously, Mr. Wright is not supposed to

15  be in that part of Texas; right?

16  A.   That's correct.

17  Q.   And how fast do you think this boat goes?

18  A.   I imagine -- I have no idea, sir.

19  Q.   10 miles an hour, something like that?  I mean,

20  it's really not much of a getaway vehicle if you have

21  to deal with the Coast Guard and things like that;

22  correct?

23  A.   My understanding from talking to people is, once

24  that boat was moving with the location it is, it would

25  actually be very hard in the time frame to coordinate a

1  response.  And also, he has bragged to others it has

2  an helicopter landing pad, which easily the boat could

3  already be moving in the water and fly a helicopter to

4  it.

5  Q.  Okay.

6          MR. GRASSO:  The Exhibits 5 and 6, Your Honor,

7  this is sort of the weight of the evidence in the case.

8  I mean, I understand it's not sort of weight of the

9  evidence because he's not charged with -- well, I have

10 a question for him.

11 BY MR. GRASSO:

12 Q.  He's not charged with any firearms offenses in this

13 case; right?

14 A.  Not currently.

15 Q.  Okay.  And so he's not -- currently, we are dealing

16 with the Indictment in this case?

17 A.  Yes, sir.

18 Q.  So this has to do with, whether he denies it or

19 not -- he hasn't had a chance to plead not guilty to

20 this, but this is not part of the Indictment that the

21 Government is seeking detention on today?

22 A.  No, this was only included on why he's a danger to

23 the community.

24 Q.  And the basis of this being a danger to the

25 community is apparently they are talking about some

1  kind of small handgun that he's apparently buying for

2  someone?

3  A.   No, sir, the reason he's a danger to the community

4  is, even though, as you mentioned, Mr. Wright was

5  subject to a court order not to possess firearms,

6  Mr. Wright's previous behavior has shown that he

7  frequently ignores federal firearms laws and frequently

8  breaks federal firearms laws and has access to guns

9  both -- illicit access to firearms.  So that's why it's

10  included as a danger to the community.

11  Q.   In these text messages they are talking about

12  purchasing a firearm at a store?

13  A.   One time, yes, sir.

14  Q.   Right.  And apparently he's dealing with R.F. in

15  this case; right?

16  A.   Yes, sir.

17  Q.   It has his name there, Raymond Bruce Fosdick?

18  A.   That's correct, sir.

19  Q.   R.F.?

20  A.   Yes, sir.

21  Q.   That's the guy who you don't know where he is right

22  now?

23  A.   Yes, sir.

24  Q.   Who's a convicted felon?

25  A.   Yes, sir.

1   Q.   And do you know that Mr. Wright knew he was a

2   convicted felon?

3   A.   Yes, sir, I do.

4   Q.   Do you know if he did know he was convicted?

5   A.   Yes, sir.

6   Q.   Do you know if Mr. Fosdick told Mr. Wright that in

7   Texas, after five years, you can own a handgun?

8   A.   I do not know if he told him that.

9   Q.   And obviously, Mr. Fosdick didn't tell you that?

10  A.   You're saying do I know if anybody --

11  Q.   If Mr. Fosdick ever told you --

12  A.   He never told me.

13  Q.   -- that he told Mr. Wright that?

14  A.   No, sir.

15  Q.   That after five years of your conviction, you can

16  own a handgun in Texas?

17  A.   I don't know if he told him that or not.

18  Q.   Do you know if Mr. Wright is a lawyer or a legal

19  expert of any type that would question that or not?

20  A.   No.

21  Q.   Okay.  And with respect to Exhibit 6, that one was

22  presented again because they talked about firearms;

23  correct?

24  A.   Exhibit 6, I believe, is the Zeta Cartel business

25  ties to the --

1   Q.   Okay, let's talk about that.  You read the defense

2   opposition where we talk about the Zeta Cartel?

3   A.   Yes, sir.

4   Q.   And the Government, in its presentation, never

5   brought up the fact that, for example -- well, let's

6   talk about that exhibit, and I'm going to be submitting

7   this as my exhibit list right here, the exhibit list

8   that I attached to the opposition.  Let's go to

9   Exhibit --

10          MR. GRASSO:  And this will be Defense Exhibit

11  1, Your Honor.

12  BY MR. GRASSO:

13  Q.   Let's go to Exhibit D, their sub-Exhibit D.

14  A.   I have it front of me, so you don't have to read it

15  to me, sir.

16          THE COURT:  Okay, wait a minute.  You're going

17  to -- you want to introduce your entire opposition as

18  an exhibit?

19          MR. GRASSO:  No, not my opposition, just the

20  exhibit list on it.  I mean, I can --

21          THE COURT:  All right, I'm just trying to get

22  what you're trying to do.  So you're saying the exhibit

23  list.  Do you mean the exhibits that are attached?

24          MR. GRASSO:  It's A through H, Your Honor.

25          THE COURT:  I'm just trying to keep the record

1  straight.  When you say the exhibit list, you're not

2  talking about a list?

3          MR. GRASSO:  No, Your Honor.

4          THE COURT:  You're just talking about the

5  exhibits that are attached A through H; right?

6          MR. GRASSO:  Yes.

7          THE COURT:  Defendant's A through H, okay.

8          MR. GRASSO:  I don't really need to submit it

9  because it's already in the record as being submitted

10 as part of my opposition.  But I guess what we'll talk

11 about, Your Honor, is --

12         THE COURT:  Okay.

13         MR. GRASSO:  I'm just pointing to, for

14 purposes of the record, Exhibit D in that series of

15 exhibits.

16         THE COURT:  All right, go ahead.

17         MR. GRASSO:  Okay.  If I can approach, Your

18 Honor?

19         THE COURT:  Go ahead.

20 BY MR. GRASSO:

21 Q.  I'm showing you what's in the defense opposition

22 as Exhibit D, and that's a Treasury Department Auction

23 House Internet page that lists the helicopter that

24 Mr. Wright bought that apparently was previously owned

25 by the Zetas; right?

1   A.   Yes, sir.

2   Q.   And that helicopter, as you can see in there, it

3   says the high bidder at I think 230-something thousand

4   dollars on that list is T.R. Wright?

5   A.   Yes, sir.

6   Q.   And if you notice on that document, it says in two

7   places, I think under the picture and I think toward

8   the end, it says, "All sales subject to Treasury

9   Department review"?

10  A.   Yes, sir.

11  Q.   And do you understand what that means?  Have you

12  researched that?

13  A.   No, sir.

14  Q.   That the Treasury Department obviously doesn't

15  want seized items to be repurchased by people with any

16  connection with the people that the item was seized

17  from; right?

18  A.   I don't know that to be a fact.

19  Q.   Well, do you think it's been tried in the past,

20  that when a drug cartel who has access to unlimited

21  amounts of cash, I guess, could send somebody that

22  could bid on a helicopter to get it back that was sized

23  from them?  I mean, it makes sense; right?

24  A.   My understanding is that if they did do such

25  checks, it's not a thorough job because nothing was

1  deconflicted with my agency.  And Mr. Wright's been

2  under investigation long before he tried to purchase

3  this helicopter.

4  Q.  But what we're talking about here is that

5  Mr. Wright's explanation in the opposition is that it's

6  about the logbooks; correct?

7  A.  My understanding, yes, sir, is the helicopter was

8  essentially worthless without the logbooks, and he even

9  said that, I think, in his own words.

10 Q.  Exactly.  Well, worthless meaning it couldn't be

11 resold.  I mean, he could fly it around and he could

12 use it for his own purposes.  You don't have to have

13 the logbooks to use the helicopter, you just can't

14 resell it?

15 A.  To make money off the deal, Mr. Wright would have

16 had to obtain the logbooks is my understanding.

17 Q.  And as it states and even in your recitation and in

18 Government Exhibit 6, he's talking about going to the

19 Zetas or getting the logbook from the Zetas?

20 A.  Yes, sir.

21 Q.  Okay.  And you understand people talk about things

22 like that, maybe a little bit of braggadocia or

23 whatever, like I'm going to have to go deal with these

24 guys to get the logbooks.  But clearly, the

25 conversation about the Zetas is "I need to get these

1   logbooks from these people."  Correct?

2   A.   The conversation is, "I'm meeting with the Zeta

3   Drug Cartel and exchanging $30,000 for some aircraft

4   logbooks that they have, which then I found out later

5   from the agents involved with this that, yes, the

6   logbooks were not taken from the original helicopter

7   and were still in possession -- thought to be in

8   possession of the Zeta Cartel.

9   Q.   Do you know the actual mechanics of this

10  transaction?  Regardless of what the text or the

11  message or whatever this is here, whether it was from

12  Facebook or whatever, do you know what the actual

13  mechanics of that transaction were?

14  A.   No, sir, I do not.

15  Q.   Do you know whether Mr. Wright actually ever met

16  with anyone in that case?

17  A.   No, sir, I personally do not.

18  Q.   Do you know whether Mr. Wright, as he states in

19  the opposition, sent a representative to pick up the

20  helicopter to service it and fly it back to where he

21  was, to Las Vegas or I don't even remember where, okay,

22  and that that person handled it through this Garza

23  lady, who was an aircraft broker?  Do you have any

24  evidence that the Zetas were actually ever involved in

25  any of this?

1  A.   Only his own words, in which he says he's dealing

2  directly with the Zeta Cartel, and just like he was

3  sending someone -- I believe he says, in his own words,

4  they will use a messenger and broker, as well.  So, in

5  his own words, he says he's going to meet with the Zeta

6  cartel.  They know they have to have a broker.  He says

7  they will use a messenger broker, as well.  He was

8  going to send Mr. R.F., as we talked about, who is

9  known to do, by his own admission and other facts known

10 in this case, dirty work for Mr. Wright.  And then he

11 tells Mr. R.F. to bring a gun.

12         So my understanding is that's all I have to go

13 by is "I talked to Mr. R.F." and his own text messages.

14 Q.   But the point is we're not talking about Mr. Wright

15 meeting with the Zeta Cartel because he's conducting

16 some kind of drug transaction or some kind of firearms

17 transaction.  He's trying to get the logbooks for an

18 item that he legally bought from the Treasury

19 Department?

20 A.   And my understanding is the logbooks were -- my

21 understanding of how things work is, when they pay the

22 Zeta cartel for the logbooks, that money goes right

23 back to the Zeta Cartel.  It's not like these logbooks

24 were at Logbooks-R-Us where they went in to buy them.

25 In his own text messages, he's saying he's dealt -- and

1  I obviously don't know what eventually happened, as I

2  just testified, but in this he's saying:  I'm going to

3  deal directly with the Zeta Cartel for logbooks, for

4  helicopters that the United States Government seized

5  for involvement in a drug trafficking organization, and

6  he's going to send someone to buy these logbooks for

7  him.

8  Q.   Do you know that by 2015 the Zeta Cartel was

9  defunct?

10 A.   That is not to my knowledge.

11 Q.   That the last of the big bosses of the Zeta Cartel

12 were brought down by the DEA and Mexican Government and

13 there has just been a lot of stuff written about it?

14 A.   My understanding is the Zeta Cartel still operates.

15 Q.   Okay.  I cite to -- did you see where I cite to an

16 article?

17 A.   Yes, sir, I understand these two individuals whose

18 helicopters were taken out by U.S. law enforcement, but

19 it is a continual battle by U.S. law enforcement

20 against the drug cartel.

21 Q.   Okay.  But in other words, it's clear, though, all

22 the information you have is that the logbooks were

23 being sort of held hostage by somebody and they wanted

24 money?

25 A.   That's my understanding of these text messages,

1  yes, sir.

2  Q.   Last question about this:  Do you have any

3  information that Mr. Wright paid for these logbooks

4  with a cashier's check for around $31,000?

5  A.   I do not, sir.

6  Q.   Okay.  But there is obviously a paper trail if that

7  were the case; correct?

8  A.   That would be the case, yes, sir.

9  Q.   The flight plan information that you indicate about

10  him not filing flight plans, do you know what the rules

11  are with respect to filing flight plans?

12  A.   Only when I talked with aviation officials, the

13  FAA, and other places.

14  Q.   That certain short flights, like demonstration

15  flights, acrobatic flights, flights that fly around in

16  airports, don't require a flight plan?

17  A.   I've seen they have discussed that as well, but

18  that it is common practice to file a flight plan if you

19  are going from, like you mentioned, different airports.

20  Q.   And do you have any information that Mr. Wright, as

21  is indicated in one of the exhibits that I filed with

22  respect to an air traffic controller who knows him

23  personally, flies by the letter of the law, that he

24  files flight plans whenever one is required?

25  A.   No.  In fact, I know the opposite.  Mr. Wright flew

1   a plane into Athens, Texas, a jet, the jet that burned,

2   and no flight plan, at least to my knowledge, was ever

3   filed.  And I made contact with the FAA and Air &

4   Marine Operation Center researching that plane and was

5   not able to find that flight plan, or at least they

6   were not able to find it with me.

7   Q.   Do you know anything about it being a short flight,

8   VFR 17-5, not requiring a flight plan?  Do you know any

9   of those terms?

10  A.   I've heard those terms, sir.  I don't know.  All I

11  know is, again, what I told you, that it is common

12  practice to file flight plans, even from airport to

13  airport.  I have no knowledge on that, sir, I'm not a

14  pilot.

15  Q.   You understand that he's given up his pilot license

16  to Pretrial Services?

17  A.   Yes, sir.

18  Q.   That was one of the conditions.  I mean, his

19  business is flying planes and buying and selling; right?

20  A.   Yes, sir.

21  Q.   Do you think that maybe a pilot who doesn't file

22  flight plans and regularly goes around flying around

23  without filing flight plans, do you think that may

24  affect the person's license -- pilot's license?

25  A.   To my knowledge, unless you can -- it does not.  I

1  mean --

2  Q.   Does not?

3  A.   I don't know, I don't know the answer to that

4  question, actually.

5  Q.   What was that?

6  A.   My understanding is that it has been brought to the

7  attention of other individuals, but I don't know why

8  that would be, sir.

9  Q.   So are you saying that it's your -- are you saying

10 that a person can fly a jet around the United States

11 post-9/11 without filing flight plans and there's no

12 problem, it doesn't even affect your license, you won't

13 even lose your license?

14 A.   All I know is Mr. Wright did not file a flight plan

15 when he flew a jet into Athens, Texas.

16 Q.   Do you know how long that flight was?

17 A.   I do not, no, sir.

18 Q.   Do you know how short that flight was?

19 A.   I know it's a fairly long distance from -- to

20 Athens, Texas.  We're not talking about a couple miles.

21 We're talking a large distance.

22 Q.   Do you know what the cutoff is for filing --

23 A.   I do not, no, sir, I'm not an aviation expert.

24 Q.   Okay.  Do you know if -- I mean, you found that

25 flight; correct?  You were able to find a record of it?

1  A.   No, sir.

2  Q.   Well, how do you know about it?

3  A.   Through most of Mr. Wright's own testimony to me

4  that he flew that plane in Athens, Texas.  Well, when

5  we looked back, there is no flight records.  I know

6  where it was the day it took off in Uvalde, Texas.  It

7  somehow ended up in Athens, Texas with Mr. Wright

8  behind the controls.

9  Q.   Do you know how long that flight -- I mean, do you

10  know what the cutoff is?  I think you said you didn't.

11  A.   No, sir, I don't.

12  Q.   Okay.  With respect to the condo, do you know that

13  the Trump Tower in Las Vegas is the Trump Tower and

14  Condominiums; correct?

15  A.   I do not know that, sir.

16  Q.   Do you know that half of that building, that Trump

17  Tower in Vegas, is a condominium?  Did you know that?

18  A.   No, sir, I did not.

19  Q.   Do you know that Mr. Wright uses that as home base?

20  A.   I do know that he's used that before as home base,

21  yes, sir.

22  Q.   Correct, he used that as a station -- do you have

23  any dispute over the fact that as of September 1st of

24  2014, he's been living there and then traveling for

25  business and going back to live there and traveling for

1  business?  Do you have any reason to dispute that?

2  A.   I have him in other places, yes, I've seen him

3  living in other places.

4  Q.   True, he travels around, that's the nature of his

5  business; correct?

6  A.   I don't know, but yes, sir, I've seen him living at

7  other places.

8  Q.   But from your direct examination, he seems to come

9  back -- he's lived at the Trump Tower before; right?

10 A.   Yes, sir.

11 Q.   And he was living there when he was arrested?

12 A.   We were told by building management that he was

13 renting.

14 Q.   Right, he's renting?

15 A.   Yes, sir.  It's like you rent a hotel room.

16 Q.   Well, but do you understand these are condos that

17 are in there, that you rent long term?  By long term, I

18 mean more than three or four days or a week, you rent

19 condos in the Trump Tower.  Do you have any reason to

20 dispute that?

21 A.   I have no reason.  I mean, just like you rent at

22 the Residence Inn, my understanding is it's very

23 similar.  You know, it's a hotel that you rent, from

24 what they told us.

25 Q.   Okay, but they are -- well, so the last time he's

1  been living there for like about a month?

2  A.   That's my understanding.

3  Q.   Correct?

4  A.   My understanding was he had been -- we had

5  information that he had been moving around and that he

6  had been coming and going and we only recently found

7  out that he had been there long term, but that's my

8  understanding how long he actually was there.

9  Q.   Okay.  So you understand that he travels to Europe

10 a lot?

11 A.   Yes, sir.

12 Q.   He's right now working two deals in Europe:  One

13 for the three fighter trainers in France.  You saw the

14 letter in the exhibit, that deal.  And he's also

15 working the Israeli deal for those 24 Israeli fighter

16 trainers or whatever, jet trainers?

17 A.   Yes, sir.

18 Q.   So he needs to stay in Europe for a while

19 sometimes, no one is disputing that; right?

20 A.   No, sir.

21 Q.   Okay, one second.

22          That's all I have.  Thank you.

23          THE COURT:  I guess you can step down.  Thank

24 you.

25          THE WITNESS:  Yes, sir.

```
1          THE COURT:  What else does the Government have?
2          MR. COAN:  Your Honor, with respect to live
3  testimony, that concludes the Government's
4  presentation.  I would only ask that the Court take
5  judicial notice of the Indictment for purposes of the
6  presumption.
7          THE COURT:  Okay, I've already gone over that.
8          MR. COAN:  That concludes the Government's.
9          THE COURT:  All right, what about from the
10 Defendant?
11         MR. GRASSO:  We don't have anything, Your
12 Honor, I mean, any other evidence --
13         THE COURT:  Okay.
14         MR. GRASSO:  -- to present other than what
15 we've presented through exhibits.  I mean, obviously,
16 Mr. Wright is going to maybe make some statements as
17 part of the argument.  I don't know if the Court wants
18 to hear from him.  I mean, my practice --
19         THE COURT:  You're going to have your client
20 make your final -- your closing argument?
21         MR. GRASSO:  No, no, not at all.  I'm just --
22 I know this isn't a trial, Judge.  It may appear like
23 it is, but it is not a trial.
24         THE COURT:  I understand.
25         MR. GRASSO:  In my practice, I'm coming from
```

1  another jurisdiction.  Sometimes the judge will address

2  the defendant, not to have him talk about the facts of

3  the case, but to say, "You understand" -- you know,

4  like --

5        THE COURT:  Yes, I understand what you're

6  talking about.  One of the things I was going to bring

7  up was --

8        MR. GRASSO:  As to residence and things like

9  that.

10        THE COURT:  A lot of -- I'm sure the judge has

11  the same or virtually the same bench book that I do.

12  There is a standard almost script of questions.  But

13  typically, it seems to assume that a total stranger has

14  shown up.  I've had counsel who have not provided very

15  complete and good briefs like you have.  In fact, I've

16  had two rounds from y'all, so I have a pretty good idea.

17        I mean, my script starts off with:  What

18  is your name, how old are you, and do you speak English,

19  which I've already asked that once.  I don't mind going

20  through that, but the -- I mean, if you think -- a lot

21  of it deals with information relevant to considerations

22  of fixing bail.  Frequently, attorneys are a little bit

23  leery about putting their client up to have a judge ask

24  them a bunch of questions.  If you think that would be

25  appropriate and you want me to do it, I'll be glad to.

1  But I've got pretty lengthy briefs from both sides,

2  especially from you.

3            Well, all right, step on up, Mr. Wright,

4  let's go.

5        MR. GRASSO:  Your Honor, I only do this

6  because I've been doing this almost 30 years, but I've

7  never been in a detention hearing like this with this

8  much -- you know, with this much complexity.  Not to

9  say that I'm not blaming anybody or saying it shouldn't

10 be happening.

11       THE COURT:  I'll readily grant that I seldom

12 see something with this complexity either.

13       MR. GRASSO:  And sometimes it takes --

14 sometimes you've got to think outside the box in some

15 of these situations because it means everything to have

16 him remain at liberty.  And so I understand the Court

17 is not going to be up there trying to question him

18 about the facts of the case.  So, as long as that's,

19 you know, that's the case, which I know it will be, I

20 have no issues with Mr. Wright answering question from

21 the Court.

22       THE COURT:  I have never had a detention

23 hearing, either, where before anybody walks in, I have

24 the answer to virtually every single question of the

25 standard questions that judges normally ask:  Are you

1   married?  Do you have any children?  Are you living

2   with your spouse?  How are you employed?  How long have

3   you worked?  I mean, all of those.  If you think there

4   is something to be gained from me hearing him say it,

5   I've got no problem with it.

6          MR. GRASSO:  Not just that.  I'm just

7   wondering, after these two rounds that we have just

8   gone through with the witness on the stand, if there is

9   any questions the Court has regarding the two issues,

10  his risk of flight and his -- because I can tell you,

11  he can explain.  He's a very experienced pilot, he's a

12  very experienced person, and when he talks about this

13  stuff, it's a lot smarter sounding than when I talk

14  about it.

15          So my point is, if the Court has any

16  questions about any of these issues, such as flight

17  plans and things like that, that don't have to do with

18  what Count 1, Count 2, Count 3 through Count 7, I don't

19  have any issues with that, Your Honor.  I think we need

20  to have Mr. Wright lay out -- why don't we do it this

21  way:  I'll put him on the stand and we'll address and

22  I'll ask him questions.

23          THE COURT:  That might work a little bit

24  better, but the other thing I'm looking at is the time.

25          *[Court confers with the court reporter]*

1          Let's go ahead and take a 10 minute break,

2    we've been here a while, to let everybody who needs to

3    go to the restroom go ahead and do that.  So we'll be

4    in recess.  And if y'all need a break, you can.

5          We're in recess.

6          *[Recess]*

7          THE COURT:  We're back on the record.  Note

8    for the record that I do have a copy of the Pretrial

9    Services Report from the officer, I think I mentioned

10   this before, the officer in Las Vegas, and obviously

11   the order setting conditions of the judge in Las Vegas,

12   along with the docket and the bond and so forth that

13   was set.  So I have all that information and, of

14   course, the briefing on both sides.

15          So what would you like to do next, counsel?

16          MR. GRASSO:  Your Honor, we've talked about it

17   and, actually, even Mr. D'Angelo spoke with the

18   Government on it, and I think the best route right now

19   would be to just submit it by proffer as part of our

20   argument.

21          THE COURT:  All right, go ahead.

22          MR. GRASSO:  So we're basically just finishing

23   up here with this entire hearing is what I understand.

24          THE COURT:  All right.

25          MR. GRASSO:  I guess I go first?

1    THE COURT:  No, actually, let's hear from the

2  Government first.  Yeah, go ahead.  It doesn't matter.

3  You put on most of the evidence.

4    MR. COAN:  Thank you, Your Honor.  What's

5  before the Court is the release order entered by the

6  magistrate judge in Nevada, and the Government would

7  ask this Honorable Court to revoke that order and enter

8  an order detaining Mr. Wright pending trial.

9    The Court has previously recognized that

10  this is a presumption case, and to the extent there is

11  consideration by the Court that that presumption has

12  been rebutted, it doesn't disappear.  The Court is

13  aware of the case law.  It doesn't float away.  It

14  remains in the case as a relevant consideration along

15  with the other factors in 3142(g).

16    And as has been pointed out several times,

17  as obvious, this is not the trial, far from it.  This

18  is a detention hearing and the Government's burden, if

19  the presumption has been rebutted, is:  Has there been

20  evidence established by a preponderance of the evidence

21  that this Defendant presents a flight risk,

22  specifically that there is no condition or combination

23  of conditions that would reasonably assure his

24  appearance at all prior proceedings.

25    And as the Court is aware, the

1    Government's burden on the second prong under 3142(e)

2    is a clear and convincing standard with respect to the

3    issue of whether this Defendant presents a danger to

4    the community, and the Government would submit that

5    such evidence has been presented, that there is no

6    condition or combination of conditions that would

7    reasonably assure the safety of the community.

8              There have been conditions imposed in

9    connection with this Defendant's release and the

10   Government respectfully disagrees with the sufficiency

11   of those conditions and would ask that this Court

12   revoke the present order and enter an order detaining

13   Mr. Wright pending trial.

14             THE COURT:  Let me ask, I mean, the whole

15   obvious purpose or one of the purposes of the Bail

16   Reform Act -- and you take that in conjunction with the

17   Speedy Trial Act -- is I guess the antipathy that

18   Congress had and good lawyers would have.  I always get

19   looks of amusement from both defense and lawyers and

20   prosecutors when I remind them, you know, he's presumed

21   innocent at this point.  And defense lawyers look at me

22   like, "Gee, I haven't heard that from a judge in my

23   entire career."  And the prosecutors say, "What?"

24             But the idea of someone who's presumed

25   innocent, I take him away from his business and I order

1   him confined, and then there have been some horrible

2   cases of this going on five months, six months, eight

3   months, 10 month or more.  And in this case it sounds

4   like all the co-defendants, although they could have

5   been in custody, aren't; and if he's the only one, how

6   long do we wait until you're ready to go to trial?

7   And, you know, we've all seen cases where it's a drug

8   conspiracy and they get the first round and there is a

9   Motion for Continuance and they get the second round

10  and so forth.

11          But you don't see this discussed in cases

12  very often, but the whole purpose of the Act and so

13  forth is to consider that.  And this is an odd case in

14  that he showed up, he's here.  These other two, who

15  knows where they are going to be, and I haven't heard

16  anything at all about the third one.

17          I mean, how long, counsel, do you think I

18  should, by ordering him detained, allow it to carry on

19  before I say, "Okay, that's it, I know you don't have

20  the other guys here, you need to go to trial, he needs

21  to either be found guilty or not guilty and move on

22  about his life."  And I'm not talking about a matter of

23  weeks, but where are you, where are we on this thing?

24          MR. COAN:  Well, I can tell you that certainly

25  arrest warrants have been issued in connection with the

1   Indictment --

2          THE COURT:  Sure.  Two of them, we don't know

3   where they are even though they confessed from what I

4   heard.  And the third one, I didn't hear he confessed,

5   but I didn't hear that he's likely to be here.  And I

6   guess what I am indicating in reality is I'd be much

7   more likely to listen for a Motion for Continuance past

8   70 days from the Government that, if he's not in

9   custody, well, you know, you need some time to get --

10  find these people, run them down, and so forth.

11         I mean, you take a guy away from his

12  business for six months or a year and you pretty well

13  destroy him whether he's convicted or not.  I mean,

14  that's just a practical -- and I know they don't talk

15  about it in the case books and you don't hear about it

16  in law school, but we've all been around this business

17  a long, long time.

18         Have you given some thought to, can you be

19  ready in a couple of months and are you ready to go

20  ahead and try this case even though for some reason the

21  others have completely absconded or, based on how the

22  testimony of how dangerous this man is, they've been

23  done away with, so they are never going to show up?

24         MR. COAN:  Your Honor, those are legitimate

25  considerations and very practical considerations.  A

1   couple of points:

2           One is, the whereabouts of the one

3   individual, the co-defendant, who was referenced

4   earlier R.F., his whereabouts are unknown.  As I

5   understand, we believe that we can locate the other

6   two.  I don't know if that means they will be arrested

7   this week or next or four weeks from now.

8           The second point, I would offer about

9   practical considerations of the Defendant's business is

10  that his business is the subject of this case.

11          THE COURT:  Sure, if you're correct, then no

12  harm done.  But again, I'm supposed to be presuming him

13  to be innocent.  I mean, we've all heard that in law

14  school and I kind of remember it once in a while.  And

15  that sounds so funny for me to be saying it and lawyers

16  always smile when I bring that up.  But here I am being

17  asked to take someone into custody for an undetermined

18  amount of time, and if it turns out he's not guilty, I

19  mean, that's not even innocent.  Not guilty means it

20  couldn't be proved to a jury.  I understand that, too.

21  I have been on both sides of a criminal docket as a

22  lawyer.  So not at the level you are at.  The cases I

23  handled were much smaller cases, but I have some

24  feeling for what you are trying to prove and what

25  counsel on the other side are trying to do.  But to

1  say, well, his business is a crime, that hasn't been

2  proven yet.

3          MR. COAN:  Understood.

4          THE COURT:  I'm supposed to be thinking of,

5  well, gee, what if it isn't, what if he's not guilty,

6  then what have I done to him?  And there is a

7  difference between a few weeks and six or eight months

8  or a year while we're still waiting for these other

9  guys to come in.  And so the question might be, well,

10  you've got to go ahead and try your case and maybe try

11  it again later if the other guys are ever rounded up.

12  That's the practical thing that I would at least be

13  thinking of somewhere along in there.

14              Originally, I thought when it said these

15  guys had confessed, I was thinking, okay, we've got

16  pleas just about ready to go.  It's a whole lot

17  different than I'm finding out today.

18          MR. COAN:  Your Honor --

19          THE COURT:  Go ahead.

20          MR. COAN:  -- mentioned earlier, as part of

21  one of the exchanges, considering this issue of

22  detention and considering the three co-defendants about

23  whether there -- if there was a detention situation, if

24  they are detained, there came a time where the delay

25  associated with apprehending the co-defendants began to

1   operate as some prejudice, whether evidentiary or

2   otherwise, against the first defendant who was

3   apprehended, and that may be a way to approach the

4   present situation with the Court.

5           If the Court did order that this Defendant

6   was detained today, then the parties obviously would be

7   monitoring the developments regarding the other

8   defendants and recognizes the Court would be mindful of

9   how much time is passing in the case and then whether

10  this issue of detention should be revisited at a later

11  time would and could be considered by the parties as a

12  change in circumstances that would justify bringing it

13  back to the Court's attention.

14          THE COURT:  And that's a good possibility.

15          Okay, anything else then on your closing?

16          MR. COAN:  No, Your Honor.  Thank you.

17          THE COURT:  How about from the Defendant?

18          MR. GRASSO:  Thank you, Your Honor.  And it's

19  always -- I've never been in this district, although I

20  have practiced in different parts of the west,

21  basically, in the United States and the East Coast,

22  too.  It's hard to sort of gauge how each court does

23  things.  And I do always remember, there was a judge in

24  the District of Nevada named Judge Crow, and you may

25  have heard of him.  He's retired now.  And on the

1  podium he has a plaque just nailed right to the podium,

2  and it says:  On November 3rd, I believe, 1863, two

3  men spoke at Gettysburg.  One spoke for two and a half

4  hours and the other one spoke for two minutes.  Does

5  anybody remember who spoke for two and a half hours?

6  That's basically what the plaque says.  So less is

7  more, I think, in a lot of these situations, and I

8  don't want to also put my foot in my mouth.

9          All I can tell the Court is that since

10 this occurred, since he was released -- and again, this

11 was a case I know Judge Hoffman, the magistrate judge

12 in this case, he's not a liberal type judge, it is not

13 a very liberal jurisdiction over there in Las Vegas,

14 and he released Mr. Wright the minute -- the day he got

15 out the next day, because what happened was the thing

16 happened at 3:00, and by the time the release order

17 came in, he was already back to the holding facility

18 and they had to do it the next day.

19          And he was at my office, he was with his

20 wife.  Actually, he has been very concerned about this

21 case.  I never give my cell number to my clients hardly

22 ever.  This was an exception.  Mr. Wright has been

23 concerned, not bothering me, but just always in contact

24 with me.  He's very, very adamant about this case.  He

25 has a lot of -- I didn't want to get into the facts of

1  the case and I'm not going to here, but he has

2  extremely, extremely well positioned defenses to these

3  charges from what I can tell in my experience, Your

4  Honor.

5           The Court released him on an electronic

6  monitor.  He gave up whatever firearms he had in his

7  possession.  He's been complying with every court

8  order.  He even got to the point where, when he had to

9  drive here two days ago when he began to drive, he

10  texted and emailed the Pretrial Services Officer so

11  times that she finally told him, listen, just go, just

12  go.  Because he wanted to make sure that Pretrial

13  Services knew he was leaving -- even though he was

14  under court order to be here, that he was leaving.

15           A lot of these allegations have to do with

16  some years ago, Your Honor.  The important thing for

17  the Court is that these allegations where you get

18  things like he made death threats to people and things

19  like that, these are coming from these other

20  individuals who are not around right now.  There is

21  nothing in the texts or nothing in writing about those

22  very important and very serious details regarding

23  threatening people, things like that.

24           The connections that he has, I think the

25  Court is well aware of this thing with the Zetas.  It's

1    not a connection with the drug cartel, it's simply a

2    businessman trying to get his logbooks so he can sell a

3    helicopter that he bought from the Government.

4              So the most important thing is, Your

5    Honor, that, you know, I thought about this and, you

6    know, if someone is going to get out, if someone is

7    going make a run for it, since he apparently has so

8    much access to things to make a run for it, wouldn't

9    you think he would make a run for it before going

10   through the whole rigamarole of paying a lawyer and

11   hiring a lawyer and defending himself and appearing in

12   another jurisdiction?  I mean, he's done all those

13   things.  He's hired me, he's hired Mr. D'Angelo, who is

14   from my understanding, and I've known him for years, a

15   very respected member of this bar.  He's always in

16   contact with us.  He's done everything possible just

17   again to defend himself.

18             What he's very concerned about is, apart

19   from just obviously being away from his family -- by

20   the way, his in-laws are here, who've been behind him.

21   Actually, when he was arrested, they flew in to Las

22   Vegas from their home in Missouri and have been with

23   them the entire time because they are so concerned

24   about what's going on with him.  They have been

25   baby-sitting with the 23-month-old baby so that he and

1  his wife can come to my office and talk about the case.

2            And this is a family, Your Honor, these

3  are real people.  The in-laws own a farm in Missouri.

4  They've owned it -- it's been in the family for

5  hundreds of years.  These are not fly-by-night people.

6  The fact that Mr. Wright's business requires him to be

7  all over the world doing things with airplanes doesn't

8  mean that he doesn't have a home base and that he

9  doesn't live in Las Vegas.  He just lives the way he

10 lives because he can't just -- he feels that it's

11 probably better for him not to buy a house and just to

12 be able to live in different places.  But he

13 understands now.  He's under court order, he needs to

14 be in Las Vegas.  He can only travel here for court

15 hearings.  He clearly, clearly abides by that, Your

16 Honor.

17            And the most important thing, all I can

18 say is, even driving here, he didn't want to drive on

19 10, which would have been easier.  He took a

20 round-about way to go down through Dallas and come here

21 because he didn't want to -- he thought maybe if the

22 monitor people saw that his monitor was near Mexico,

23 that it might trigger some alarms or something that he

24 was going to Mexico.  So that's why he didn't go on 10.

25 He went the northern route to get here.  That's how

1   concerned he is about complying with all the court

2   orders.

3          And I think the Court is very correct,

4   Your Honor, in saying that this is somebody whose

5   business requires -- he's the whole thing, he's the

6   business.  He doesn't have a staff, he doesn't have --

7   he calls people, makes deals.  The fact that he can't

8   travel for his business now is going to handicap him to

9   some extent, but he can work around it.  I've asked him

10  about that.  He says, "I can work around it.  I can

11  send representatives, I can work around it.  I can

12  still buy the three planes."

13         And by the way, these planes -- as it says

14  in the letter, the letter from the French individual,

15  these planes that he purchased, these three Mirage 5

16  fighter jet trainers that he purchased in France --

17  what's that guy's name from Microsoft?  Paul Allen, one

18  of the founders of Microsoft, he tried to import those

19  planes because he collects these things.  And the

20  French Government didn't give him permission to import

21  the planes, but they gave TRW Enterprises the

22  permission because he's worked with the French

23  Government for so long and there are so many -- you

24  know, so well that they have allowed him now to export

25  these planes to the United States or to sell to

1  collectors, because that's really what these planes are

2  for.  Apparently now there are companies that have

3  shown up where, you know, you can fly in a fighter

4  plane for fun for a thousand dollars for five minutes

5  or whatever.  Those are the companies that buy these

6  kinds of planes, and that's what his business is about.

7           He's done hundreds of transactions.  The

8  Government has taken a few transactions to charge him

9  with, but he's does hundreds of transactions a year

10 without any issue, and he has a legitimate running

11 business, and he's not going anywhere, Judge.  He's got

12 too much to lose running away.  He wants to defend

13 himself.  He's not going to have contact with anybody

14 who he's not supposed to have contact with.

15          I've been doing this a long time, Your

16 Honor, but he's here, he's showed up.  He showed up.

17 If he was going to run, he would have done it by now.

18 He's here, he wants to take this seriously.  He

19 respects the Court, he respects the process.  He just

20 wants to defend himself and he wants to have the

21 ability.  If he's taken into custody, the Court knows

22 it better than I do because the Court said it better

23 than I can say it.  If he's taken into custody, it's

24 going to destroy his business.  And I know he's going

25 to be under a microscope and he knows he's going to be

1 │ under a microscope, but he just would like the ability

2 │ to defend himself.  Whatever happens in this case, if

3 │ we enter a plea or if go to trial, he'll accept the

4 │ outcome of that.  He's here to accept that outcome.

5 │          And the last thing I want to talk about,

6 │ Your Honor, is the presumption aspect.  Here's my take

7 │ on it.  I understand the Court's ruling.  I've been

8 │ doing this a long time.  I'm not disputing the Court's

9 │ ruling.  The Court is in a tough spot.  It's a case of

10 │ first impression.  The Court made a call.  That's a

11 │ position lawyers and judges have to be in all the time.

12 │ No issues with that.

13 │          However, as you can see from the cases

14 │ that were cited, even that case they found up in

15 │ Arizona, it was clearly a case where they were blowing

16 │ up buildings or sending bombs to buildings.  This case

17 │ doesn't have that.  It doesn't have -- it has,

18 │ accepting the Government's facts as true, Mr. Wright

19 │ sending an individual to light his own airplane on

20 │ fire.  That's what the allegation is.  It's by itself,

21 │ there is nobody in it, it's a controlled situation, and

22 │ it has nothing to do -- I'm not saying that's a good

23 │ thing to do or it's right or it wasn't breaking the law

24 │ if that's the case and it really did happen, but it's

25 │ not a terrorism case, it's not an explosives case.

1          So I know there is a presumption that the

2    Court found here.  But when you look at that in

3    connection with everything else, with the facts of the

4    case, with Mr. Wright's not having any prior

5    convictions at all, with Mr. Wright complying with the

6    Court order the way he has and he's shown and he's been

7    here, I think all those things say to the Court to just

8    let the order stand that Nevada imposed and now that it

9    will become this Court's order.  And Mr. Wright will

10   show you that as far as this case is concerned, you are

11   not going to have any problems out of him.

12          Thank you, Your Honor.

13          MR. D'ANGELO:  Judge, may I, if I could, add

14   just a bit to that before we con conclude?

15          THE COURT:  Sure.

16          MR. D'ANGELO:  You know, adding the unique

17   perspective of practicing in this district, I do a

18   great deal of criminal defense work here, and I think

19   the Court would agree with me that this is not the

20   typical defendant that we see come before the Court for

21   a pretrial determination.  This is a unique case.  We

22   don't do a lot of, quote-unquote, white collar cases in

23   this district with defendants who have such significant,

24   not only prestigious, but well-established ties in

25   their industry.  We typically go through defendants who

have extensive criminal histories, who are involved predominantly in drug cases, where there is an indicia that they will continue to abuse substances, that they will be a risk of flight, that they will re-offend. Judge, I don't see --

THE COURT: Well, how do I deal with the fact that he's got no ties to the Eastern District?

MR. D'ANGELO: And I'd like to, if I could, Judge, address what I think the Government has spent a great deal of time on, and that is the unique characteristics of this individual, his skill set. If the Court were for a moment to set aside the bulk of the Government's detention argument, which is focused on his unique skill set and that that somehow will facilitate this case, I think that's walking down a very dangerous path because that argument can be extrapolated -- and I will address the Court's issue of ties, but that issue can be extrapolated to any number of skill set.

If he were a Kenyan marathon runner who lived near the Mexican border, an argument could be made that, you know what, even on a monitor, he can put olive oil on the monitor and go for an all night jog and make it to Mexico. He could acquire travel documents that are fraudulent. If the Court would to

1    set aside his unique skills as a pilot and just look at

2    him, the fact that the Pretrial Services Report suggests

3    that he should be released, what he has to lose, what's

4    in this courtroom, what Mr. Grasso has said very

5    eloquently, that if he had to take an opportunity to

6    flee to a non-extradition nation, he sure as heck would

7    have done it as soon as he got word that the Government

8    was questioning his release and that he was being

9    ordered to come here for a hearing.

10             Now, to address the Court's concern with

11   respect to ties, Judge, he has local counsel here.  I

12   would be in constant communication.  Mr. Grasso and I

13   have 30 years together.  We are very close friends, we

14   communicate very regularly.  Mr. Grasso is a very well

15   respected attorney in his district.  The fact that we

16   have a local element to this case would, I think, give

17   this Court a degree of comfort in knowing, because if

18   there were ever a hesitation with respect to an issue

19   of pretrial release, I'm here and I can be here on a

20   moment's notice to address any issue.

21             But, Judge, I would ask the Court to set

22   aside what are, quite frankly, remarkable skills that

23   this man has and talents and not prejudice him with

24   those talents.  Because setting aside those talents,

25   here is a man with no criminal history, a successful

1  business, a family who is here before this Court with

2  his family, and who has demonstrated since his release

3  that he can follow the Court's rules.  Give him the

4  chance to continue to follow those rules, Judge,

5  because, as you very well stated, it will be

6  devastating for him to go in.  He has much to lose,

7  including his ability to effectively defend himself.

8          And again, if he were a marathon runner,

9  would that be the argument that the Government would

10 then be advancing, that he could just take off at night

11 and go over the Texas border to Mexico?  If somebody

12 were sincerely going to evade pretrial release, then no

13 defendant would be eligible for release because any

14 defendant under any scenario could figure out a way to

15 get out of this country, and that's simply not the

16 standard.

17         That being said, Judge, I have nothing

18 further to add.  Thank you.

19     *[Pause]*

20     MR. GRASSO:  Your Honor, one last thing.

21     THE COURT:  Sure.

22     MR. GRASSO:  I just asked my client.  If the

23 Court orders him, he would live here if he had to, to

24 be able to stay out.  He would find a residence here

25 and he would be here within a reasonable amount of time

1  to be able to move his things here.  He would come to

2  this district and live here.

3        MR. D'ANGELO:  And he would have the benefit

4  of local counsel at that point, Judge.

5        *[Pause]*

6        THE COURT:  All right.  In a case like this,

7  under the statutes, and we've gone over them, there is

8  a rebuttable presumption if someone is charged with a

9  violation of 844(i) -- 18 U.S.C. Section 844(i) --

10 because of the operation of sections 3142(e)(3)(C) and

11 section 2332b(g)(5)(B), there is a rebuttable

12 presumption that no condition or combination of

13 conditions will reasonably assure the appearance of a

14 person as required and the safety to the community.

15        Now, there is probable cause to believe

16 that Mr. Wright violated section 844(i) because there

17 has been an Indictment.  And the Indictment, a Grand

18 Jury returned an Indictment, probable cause is

19 established.  *U.S. vs. Valenzuela-Verdigo,* 815 F2d,

20 1011, at 1012.  That's a Fifth Circuit 1987.

21        To overcome that presumption, the

22 defendant has the burden of proof by a preponderance of

23 evidence that he will appear, report as required, and

24 then clear and convincing evidence he does not pose a

25 danger to the community.  *United States vs. Jackson,*

1    845 F2d, 1262, at 1264, Fifth Circuit 1988.

2              Usually, that goes into a four-factor

3    test to determine whether that presumption has been

4    overcome.

5              Factor 1 gets into the nature and

6    circumstances of the offense charged, including, one,

7    is it a crime of violence?  I don't see, especially

8    under some of the more recent decisions, that we're

9    getting that one of these is a crime of violence.  It

10   doesn't seem to involve sex trafficking.  That's not

11   part of the Indictment.  Not a federal crime of

12   terrorism, although it's one of those listed acts had

13   it been involving the Government.  Doesn't seem to

14   involve a minor victim or a controlled substance.

15   Doesn't seem to involve firearms, although he has them,

16   or explosives other than setting the fire, as alleged,

17   on the vehicle.  So, in terms of that factor weighing

18   against will he appear or not, that factor does not

19   weigh against the Defendant on that.

20             Other the other hand, evidence whether

21   Mr. Wright poses a danger to the community, this is the

22   harder one because it's the defendant's burden by clear

23   and convincing evidence.  What troubles me is we have

24   this evidence of two different people alleging or

25   supposedly stating that he had threatened them, had

1  threatened to kill them.

2           And then there is the e-mail discussion of

3  the black tip ammunition from the Secret Service.  If

4  they used the same color coding as the military, that's

5  armor piercing.  For all I know, in the Secret Service

6  it's -- I don't know if Winchester has a silver tip.

7  Black tip may mean something else.  But in any case, at

8  least in the email, it made it sound like it was some

9  sort of special ammunition used by the Secret Service,

10 and there was no rebuttal of that.  There was the

11 indication that these two people were -- cross-

12 examination about them being convicted felons and one

13 of them a sex offender.  Now, that does weigh in favor

14 of a finding against Mr. Wright on the danger to the

15 community issue.

16          Next, Factor 2, weight of the evidence

17 against the person, courts indicate that's usually the

18 least important.  He's presumed innocent.  I really

19 don't have the evidence on whether he's actually

20 committed these offenses or not.  So, in terms of

21 whether he's likely to appear for court as required or

22 pose a danger based on the weight of the evidence

23 against him on the offenses themselves, I think it's

24 neutral on both of those as to both whether he's going

25 to appear or whether he poses a danger.

1          Factor 3, the history and characteristics

2  of the person, including their character, physical and

3  mental condition, family ties, employment, financial

4  resources, length of residence in the community,

5  community ties, past history and conduct, history of

6  drug and alcohol abuse, criminal history, court

7  appearances, the only court proceeding I know he's

8  had -- well, I guess he's had two of them and I guess

9  he was there in Nevada and he's here, so that works in

10  his favor on whether he's going to show up.

11          The family ties, he's got family here.

12  That works in his favor.

13          The employment and his resources and the

14  length of residence in the community, his community

15  ties.  While it's true, as counsel pointed out, that's

16  his job, he has to travel, on the other hand, that

17  makes him very liquid and easy to move around,

18  obviously well able to move easily and live in many

19  different places.  And his wife and child evidently can

20  travel with him.  There's not really a good solid tie

21  to Nevada.  If he and they leave, there is no one else

22  left there.  In-laws in Missouri, presumably she could

23  come back and visit them.  That works against him on

24  both showing up -- on showing up, and not a whole lot

25  of evidence as far as danger to the community.

1    No history relating to drug or alcohol

2 abuse.  The only prior criminal history, I think, is

3 driving without a license, maybe in Georgia or some

4 place that I saw.

5    So, on balance, that one, I take a close

6 look at the discussion about the access to the

7 aircraft, vehicles, boats and his financial resources.

8 He obviously has a greater than normal ability to

9 leave.  We've gone on and on about the special skill

10 set he has.

11    Now, counsel makes a good point:  What

12 about the case of the long distance runner, what about

13 the person skilled in several foreign languages?  I

14 mean, there's a lot of people who might have the

15 ability to -- or what about the person where one of his

16 parents was from Mexico and the child was born here.

17 At least, it used to be that would be a Mexican citizen

18 and a U.S. Citizen and they would have the extra

19 ability to disappear down to Mexico, especially if they

20 spoke Spanish.

21    You're right, I think that argument has a

22 lot of weight, but you can't just look at all the

23 factors.  This is unusual because it's a combination of

24 the access to all these modes of transportation plus

25 the ability and the facility of which he's lived

1   overseas for a long period of time, evidently traveling

2   to lots of different places by himself and also, as I

3   understand it, with his wife and child.  That factor

4   weighs against Mr. Wright in terms of would he appear

5   for court or the likelihood of him fleeing or not

6   appearing for court as required.

7                And then Factor 4, the nature and

8   seriousness of the danger to any person or community

9   would be imposed by the person's release.  And again,

10  the burden of persuasion remains with the Government,

11  but there is a burden imposed on Defendant to produce

12  some evidence on the point when there is a statutory

13  presumption.  Here I'm looking at *United States vs.*

14  *Trosper,* 809 F2d 1107, Fifth Circuit 1987, and that's

15  the case where the Court went through the defendant's

16  attempts to rebut the presumptions, and in that case

17  indicating that he wasn't able to do it, and pointed

18  out that the Government was required to establish its

19  contention that defendant's appearance at trial could

20  not be reasonably assured by any combination of

21  conditions of bail.

22                And the Court then -- it's the one case

23  I've seen where they try to go into this shifting kind

24  of a burden, and in the end the Court points out that

25  it's somewhat similar to Title 7 of the Civil Rights

1  Act.  And in the end, "When a case (or a hearing) has

2  been fully heard, the shifting of and descriptions of

3  evidentiary burdens become largely irrelevant and the

4  question becomes where the evidence as a whole supports

5  the conclusions of the proceedings below."

6           So, while it's one thing to do, as they

7  did in *Trosper,* go through what each factor was shown

8  and who presented the evidence, it does appear that the

9  Government has shown -- and this is by a preponderance

10 of the evidence -- that the defendant is likely not to

11 appear; or if you flipped it the other way, the

12 defendant has not put in the evidence necessary or

13 tried to meet the burden, although it's a mild burden,

14 that he will appear.

15          But more importantly in this case, as I

16 said before, I'm concerned about this danger, because

17 here, if you're looking at the presumption side of it,

18 the Government has gone ahead and put out evidence that

19 the agent has about dangerousness and threats being

20 made and the fact that someone has access to pistols.

21 In Texas that's not so unusual, especially if you have

22 a concealed handgun license.  But some of the emails on

23 the kinds of ammunition and so forth, and then the

24 discussion of sale or transfer to a felon, the threats

25 that were made and no rebuttal on any of that, I

1  definitely have to find that the Government has met its

2  burden on that, that defendant did not meet the burden

3  by clear and convincing on that.  And overall on that,

4  it seems there has been a showing that he -- or there

5  has not been a showing that he would not pose a danger

6  to the community on that.

7        And so I am going to find -- and I'm going

8  to put this in writing, of course, as I'm required to,

9  but I want everyone to understand basically my thought

10  process on this.  I am going to find that the

11  Government has met its burden in this case, Defendant

12  has not met the burden he has; and overall on that, the

13  Court finds that there has not been -- I'm sorry, the

14  Government has established and the Defendant has not

15  rebutted, or if you want to look at the presumption

16  side, the Defendant has not met its burden that there

17  is no -- I find there is no condition or combination of

18  conditions that will reasonably assure the appearance

19  of Defendant as required and assure the safety of the

20  community, and so I am going to order him detained.

21        Now, I am very concerned about the length

22  of this particular detention, especially in light of

23  the fact that we have people out there who, I mean, if

24  they are picked up in two or three months and then they

25  get counsel a month later finally when we get them in

1  here, then you know that attorney is going to be asking

2  for and will rightly be entitled to a continuance to

3  get ready.  It starts to become very unfair.  I mean,

4  you either wind up having a defendant in confinement

5  far past the Speedy Trial Act time, and to the point

6  where, I mean, this is already going to work a hardship

7  on him, but far past the time that is I guess in my

8  mind reasonable in these circumstances.

9            So the Government has to be very well

10  prepared.  And obviously, if the Defendant asked for a

11  continuance, that might be different.  But I may very

12  well, sooner than would be in the normal case, say,

13  "Look, I know you don't want to try this case twice,

14  but this guy needs -- this Defendant needs his day in

15  court and you need to be prepared to go through with

16  it.  Now, I'm not talking a matter of couple of weeks

17  from now, but if we're not finding these people, we're

18  not getting them, then I'm not at all inclined to keep

19  this Defendant confined until he finally breaks down

20  and cuts a deal just to get out, or waiting and

21  wondering where these others are.  I mean, one is in

22  Hawaii.

23            Well, I guess I can't make it any clearer

24  than that.  I want the Government prepared, that if

25  we're not moving along within a reasonable time and I'm

1  going to be looking at the Speedy Trial Act and things,

2  that I might very well exercise my discretion and say,

3  "Yes, I don't like to waste the judicial resources

4  trying a case twice, but I may have to."  And so I'd

5  certainly suggest that you start getting everything

6  prepared.  Now, I also understand the Defendant and his

7  counsel may agree with you on a continuance, that they

8  don't want to go that fast, but I don't like the idea

9  in this case -- I don't like the idea in any case of

10  people being held for long periods of time before they

11  have a trial.

12          MR. COAN:  Understood, Your Honor.

13          THE COURT:  Yes, sir.

14          MR. GRASSO:  Your Honor, would -- I've never

15  asked for this before, but would the Court consider

16  allowing the defendant to remain out pending appeal of

17  the Court's order and he would remain in this

18  jurisdiction and check in with Pretrial every day, I

19  mean, at least given that he's here, he showed up,

20  knowing that the reason he was showing up here is for

21  the Court to make a decision as to whether he was going

22  in or not, it wasn't for a Motion to Suppress or

23  anything?

24          THE COURT:  No.  And in case I forget in the

25  written order, I thought about that long and hard and

1   your argument that if he's here, why wouldn't he have

2   left.  But when we're talking about a preponderance of

3   the evidence, why wouldn't he show up if he knows the

4   other people are gone and maybe never are going to show

5   up?  Why wouldn't he show up?  He really doesn't have

6   to worry until these so-called confessors show up and

7   start trying to cut their 5K1 or 35(b) deals.  Until

8   they show up, I'm guessing there is very darn little

9   evidence out there.  I mean, you've got some tapes.

10  But unless somebody is talking, how are you going to

11  tell what happened to that airplane that crashed and

12  sunk or the one that burned?  I mean, I'm not giving

13  away any surprises here.  Y'all are experienced

14  lawyers.  Somebody is going to have to come, and so why

15  wouldn't you show up if you don't think the other

16  people are here?

17          MR. D'ANGELO:  Here's my concern with that,

18  Judge.  Having tried conspiracy cases, especially one

19  in particular with the Colombian Drug Cartel where half

20  the defendants were dead or missing, co-conspirator

21  statements can come in.  So the admission that this

22  agent testified to today could theoretically come in at

23  trial and we would then be hamstrung because we would

24  have no confrontation ability and the Government could

25  theoretically put their case forward with nonexistent

1  co-conspirators.

2          THE COURT:  Well, and they could try that, I

3  understand it, but they might have to do that more

4  quickly than would normally be acceptable.

5              Well, let me hear from the Government as

6  to Defendant's request there.

7          MR. COAN:  As to allowing him to remain on

8  conditions pending appeal?

9          THE COURT:  Until appeal.

10         MR. COAN:  Your Honor, we would object to that.

11         THE COURT:  I guess in my mind that would

12  basically -- if I was going to allow that, then I

13  should have just ruled to let him out on the same

14  conditions continuously.  I mean, he's either -- I have

15  made the finding and it is my concern about the danger.

16  And also, which I think in this case actually weighs

17  more strongly on my mind than his ability to flee,

18  although that plays into it, if that is correct, then

19  allowing him out for a short time is just as bad as

20  allowing him out until trial.

21         MR. GRASSO:  My only point, Your Honor, with

22  respect to that is that if the Court were to allow him

23  to remain in this jurisdiction, that the appeal, it's

24  not as if we're going appeal this for the sake of

25  appeal.  There clearly is, and my client will

1  understand that, that issue that the Court said it was

2  a case of first impression.

3        THE COURT:  I understand that.

4        MR. GRASSO:  We have actually a legitimate

5  reason to appeal that issue.  And therefore, my client

6  would understand that, hey, I'm going to stay -- not

7  that he wouldn't do it anyway because he's been doing

8  it up to now, but cross my T's and dot my I's pending

9  this appeal because, you know, I could really have a

10  legitimate shot at maybe the Fifth Circuit reversing

11  this.  And he would stay either, I don't know, here or

12  in Tyler, but he would be checking in every day,

13  whatever other conditions the Court would set.  I think

14  it would also help -- it would also allay the Court's

15  concerns that the Court stated, which was his business

16  and things like that, being able to defend himself.

17  And then if the Fifth Circuit says you were correct,

18  then you were correct.

19        THE COURT:  I don't know what other conditions

20  I could set.  I mean, he's already on electronic

21  monitoring.  I mean, yeah, he could call in, but he

22  could call in from almost anywhere with today's

23  technology.

24        MR. GRASSO:  I mean, walk in.

25        THE COURT:  And in the day of motor transport

1  with our roads at 40 miles an hour, like back in the

2  Thirties, given where we are, that might mean

3  something.  But even a 24-hour head start in a jet or a

4  helicopter and so forth, the person is gone.  So, while

5  I understand why you are making the request, I'm going

6  to have to deny it.

7                  As I said, I'm going to go ahead and

8  reduce this to a written order, which will obviously

9  supplant, since my verbal order doesn't.  As I

10  understand it, I couldn't just rely on it anyway.  I've

11  got to submit a written order.

12                  Yes, sir?

13         MR. D'ANGELO:  Judge, I have one --

14  respectfully, one request before you remand him.

15         THE COURT:  Okay.

16         MR. D'ANGELO:  Would you please order or at

17  least recommend to the marshals that they house him in

18  Tyler so that I can have access to him?  Because if

19  he's housed here, it's going to present a tremendous

20  hardship for our ability to have contact with him.

21  It's a Tyler case.

22         THE COURT:  Right, it is a Tyler case, and

23  most of the hearings and so forth will be done dealing

24  with the Tyler.  I doubt if tonight is when he's going

25  to be placed.  I do know, in matters of transport and

1  so forth, it's a whole lot easier on the Marshal

2  Service or whoever is doing the transport, if he's up

3  in one of the facilities that deals with Tyler, if he's

4  there, because if there is any hearings, either I'm up

5  there or I'm handling it, and the marshals would be

6  bringing him from here to there.

7          MR. D'ANGELO:  I'll give them my cell phone.

8          THE COURT:  Yeah, I mean, tonight there is

9  no --

10         MR. D'ANGELO:  I understand.

11         THE COURT:  Yeah, but --

12         MR. D'ANGELO:  I just don't want him

13 here indefinitely.

14         THE COURT:  I would certainly recommend that

15 he be placed -- if anybody is wondering where his

16 hearings and trial and so forth is going to be, it's

17 going to be in Tyler and it would certainly make it

18 easier for U.S. Attorney's Office because they're

19 likely to be out of either Tyler or Plano or wherever.

20             You're in Tyler; right?

21         MR. COAN:  Yes, Your Honor.

22         THE COURT:  Yeah.  Everybody involved in this

23 case is from Tyler and I'll either be going there or

24 handling it by video.  So, if that's any consideration

25 where y'all finally put him, it would sure make it

1  easier if he was up close to the Tyler area than down

2  here, because down here it means everybody has got to

3  travel, including -- well, including everybody, just

4  about.

5            Oh, and if there is some way that he can

6  be given some food, I bet you LaSalle's food time is

7  already over.

8            DEPUTY MARSHAL:  We'll work on it.

9            THE COURT:  Okay.  I think their dinner time

10  is 5:30 or 6:00 or something like that.

11            All right.  So then Defendant is remanded

12  to custody of United States Marshal and then, pending

13  further proceedings, be delivered back to the court for

14  further hearings and trial.

15            Anything else from point of view of the

16  Government?

17            MR. COAN:  No, Your Honor, thank you.

18            THE COURT:  Anything else from point of view

19  of defendants?

20            MR. GRASSO:  No, Your Honor, thank you.

21            THE COURT:  Thank you.  And I appreciate the

22  very complete briefing both sides did on this and the

23  exhibits.

24            MR. GRASSO:  Your Honor, could he say goodbye

25  to his wife and daughter?

1        THE COURT:  To do that, I'm going to direct

2   that he self-report to the marshal at the doorway, so

3   he's not in their custody yet, so he can say goodbye to

4   them, because once he's in their custody, he can't do

5   it.  So he'll self report to you at the door.

6            Court is adjourned.

7        *[6:20 p.m. - Proceedings adjourned]*

8

9                REPORTER'S CERTIFICATE

10

11     I certify that the foregoing is a correct transcript

12   from the record of proceedings in the above-entitled

13   cause.

14

15   /s/ Ed Reed                          7-21-17
     Edward L. Reed                       Date
16   Court Reporter

17

18

19

20

21

22

23

24

25

*Edward L. Reed*
Court Reporter
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1605